IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LIGHTERING LLC, STARR INDEMNITY & LIABILITY COMPANY, and AGCS MARINE INSURANCE COMPANY | § § § § § | Case 4:17-cv-03374 |
| Plaintiffs | § § | |
| v. | § § | |
| TEICHMAN GROUP, LLC and T&T OFFSHORE, INC. | § § § | |
| Defendants | § § | |

## MOTION TO DISMISS UNDER RULE 12(B)(1) FOR LACK OF SUBJECT MATTER JURISDICTION

**SUSAN NOE WILSON**
Texas Bar No.: 15055025
snoewilson@sbsblaw.com
**MICHAEL HOGUE**
Texas Bar No.: 09809800
mhogue@sbsblaw.com
**M. LANE LOWREY**
Texas Bar No.: 24013065
llowrey@sbsblaw.com
SCHOUEST BAMDAS SOSHEA
 &BENMAIER PLLC
1001 McKinney Street,
Suite 1400
Houston, Texas 77002
Telephone: (713) 588-0446
Facsimile: (713) 574-2942

**CLAUDE L. STUART III**
Texas Bar No. 19426620
cstuart@hallmaineslugrin.com
**EVAN T. CAFFREY**
Texas Bar No. 03588650
ecaffrey@hallmaineslugrin.com
HALL MAINES LUGRIN, PC
Williams Tower
2800 Post Oak Blvd.,
64th Floor
Houston, Texas 77056
Telephone: (713) 871-9000
Facsimile: (713) 871-8962

**LYNNE LIBERATO**
S.D. No. 3072
Texas Bar No. 00000075
lynne.liberato@haynesboone.com
**MARK TRACHTENBERG**
S.D. No. 24584
Texas Bar No. 24008169
mark.trachtenberg@haynesboone.com
HAYNES AND BOONE, LLP
1221 McKinney, Suite 2100
Houston, Texas 77010-2007
Telephone: (713) 547-2000
Facsimile: (713) 547-2600

**COUNSEL FOR DEFENDANTS TEICHMAN GROUP, LLC AND T&T OFFSHORE, INC.**

# TABLE OF CONTENTS

Table of Contents..................................................................................................i

Table of Citations...............................................................................................iii

Nature and Stage of the Proceeding ................................................................ 1

Issue, Burden of Proof, & Standard of Review ............................................. 2

Rule 12(b)(1) Standard ....................................................................................... 3

Summary of the Argument................................................................................ 4

Argument and Authorities ................................................................................ 5

I.      This case does not fall within the Court's admiralty jurisdiction and should be
        dismissed. ................................................................................................. 5

        A.      A contract is not a maritime contract unless its principal
                objective is maritime commerce and it calls for substantial
                work to be performed from a vessel............................................. 5

        B.      The MSA itself, the parties' course of performance, and
                OSG's own descriptions of the MSA, demonstrate that the
                principal objective of the MSA was not maritime commerce. ................ 6

                1.      The MSA involved the provision of leased space and
                        services that were mostly non-maritime in nature..................... 7

                2.      The parties' course of performance under the MSA
                        involved mostly non-maritime services. ...................... 8

                        a.      Services measured by space: mostly (74%) non-
                                maritime........................................................... 8

                        b.      Services measured by money: mostly (84%) non-
                                maritime.......................................................... 10

                        c.      Services measured by time: mostly (88%) non-
                                maritime.......................................................... 11

                3.      OSG treated the MSA as a lease of real property. ................... 12

        C.      The fact that OSG contracted for wharf space does not render
                the MSA a maritime contract. ............................................. 13

D.   The fact that a small portion of the MSA involved vessel loading or unloading or the lease of dock space does not render the MSA a maritime contract. .................................................. 18

Conclusion ........................................................................................... 21

Certificate of Service .......................................................................... 24

## TABLE OF CITATIONS

**Page(s)**

<u>**Cases**</u>

*Adams Offshore Ltd. v. OSA Int'l, LLC,*
   2011 WL 4625371 (S.D. Tex. 2011)........................................................................ 6

*ALCOA v. Hydrochem Indus. Services, Inc.,*
   2005 WL 608232 (Tex. App.—Corpus Christi 2005, pet. denied)......................... 2

*A/S J. Ludwig Mowinckels Rederi v. Commercial Stevedoring Co.,*
   256 F.2d 227 (2d Cir. 1958)................................................................................. 10

*Alfonso v. United States,*
   752 F.3d 622 (5th Cir. 2014) ................................................................................. 3

*Alphamate Commodity GMBH v. CHS Europe SA,*
   627 F.3d 183 (5th Cir. 2010) ............................................................................... 18

*Barrera–Montenegro v. U.S.,*
   74 F.3d 657 (5th Cir. 1996) .............................................................................. 3, 4

*Beyel Bros., Inc. v. Canaveral Port Authority,*
   2006 WL 2864387 (M.D. Fla. 2006) .................................................................... 14

*Board of Comm'rs of Orleans Levee Dist. v. M/V Belle of Orleans,*
   535 F.3d 1299 (11th Cir. 2008) ........................................................................... 19

*Boyd, Weir & Sewell, Inc. v. Fritzen-Halcyon Lijn, Inc.,*
   709 F. Supp. 77 (S.D.N.Y. 1989) ........................................................................... 8

*Buck Kreihs Co., Inc. v. Board of Comm'rs of Port of New Orleans,*
   1997 WL 666220 (E.D. La. 1997) ......................................................................... 15

*Capital Yacht Club v. Vessel Aviva,*
   409 F. Supp.2d 1 (D.D.C. 2006) .......................................................................... 20

*Clark v. Tarrant Cnty., Tex.,*
   798 F.2d 736 (5th Cir. 1986) ................................................................................. 3

*Coinmach Corp. v. Aspenwood Apartment Corp.,*
   417 S.W.3d 909 (Tex. 2013)................................................................................... 2

*Constantin Land Trust v. Epic Diving & Marine Services, LLC,*
   2013 WL 1292275 (E.D. La. 2013) ................................................................. 14, 15

*Dockside Dev. Corp. v. Ill. Int'l Port Dist.*,
   479 F. Supp. 2d 842 (N.D. Ill. 2007) ................................................................. 15

*Empire Warehouse Co. v. The Advance*,
   60 F. 766 (D. Mass. 1894)................................................................................. 16, 17

*Exxon Corp. v. Central Gulf Lines, Inc.*,
   500 U.S. 603, 111 S.Ct. 2071 (1991) ..................................................................... 6

*Gaar v. Quirk*,
   86 F.3d 451 (5th Cir. 1996) .................................................................................. 4

*In re Gingrich*,
   2011 WL 6001347 (D.N.J 2011) ........................................................................... 2

*Goodman v. 1973 26 Foot Trojan Vessel*,
   859 F.2d 71 (8th Cir. 1988) ................................................................................. 14

*Gowanus Storage Co. v. U.S. Shipping Bd. Emergency Fleet Corp.*,
   271 F. 528 (E.D.N.Y. 1921) ................................................................................ 14

*Gulf Coast Shell & Aggregate LP v. Newlin*,
   623 F.3d 235 (5th Cir. 2010) ................................................................................ 6

*Harley Mullion & Co. Ltd. v. Caverton Marine Ltd.*,
   2008 WL 4905460 (S.D.N.Y. 2008) ...................................................................... 8

*Icon Amazing LLC v. Amazing Shipping, Ltd.*,
   951 F. Supp. 2d 909 (S.D. Tex. 2013)................................................................. 12

*Inbesa America, Inc. v. M/V Anglia*,
   134 F.3d 1035 (11th Cir. 1998) ...................................................................... 20, 21

*The James T. Furber*,
   129 F. 808 (D. Me. 1904) ................................................................................... 16

*J. Ray McDermott & Co. v. The Vessel Morning Star*,
   457 F.2d 815 (5th Cir.) (en banc), *cert. denied*, 409 U.S. 948 (1972)...................... 2

*J.A.R., Inc. v. M/V Lady Lucille*,
   963 F.2d 96 (5th Cir. 1992) ................................................................................... 6

*Jaspriza v. Schlumberger Tech. Corp.*,
   2010 WL 4879442 (E.D. La. 2010) ......................................................... 13, 14, 15

*In re Larry Doiron, Inc.*,
   879 F.3d 568 (5th Cir. 2018) ........................................................... 4, 5, 6, 18, 21

*Lowe v. Ingalls Shipbuilding,*
  723 F.2d 1173 (5th Cir. 1984) ............................................................. 4

*Maritima Petroleo E Engenharia LTDA v. Ocean Rig 1 AS,*
  78 F. Supp. 2d 162 (S.D.N.Y. 1999) ...................................................... 8

*New Hampshire Ins. Co. v. Home Sav. & Loan Co. of Youngstown, OH,*
  581 F.3d 420 (6th Cir. 2009) ......................................................... 16, 17

*Norfolk Southern Railway Co. v. Kirby,*
  543 U.S. 14, 125 S. Ct. 385 (2004) ................................. 4, 5, 6, 18, 21

*Paterson v. Weinberger,*
  644 F.2d 521 (5th Cir. 1981) ............................................................... 3

*Proleride Transp. Sys., Inc. v. Union Carbide Corp.,*
  498 F. Supp. 680 (D. Mass. 1980) ..................................................... 14

*Royal Ins. Co. v. Pier 39 Ltd.,*
  738 F.2d 1035 (9th Cir. 1984) ........................................................... 14

*Shipping Fin. Servs. Corp. v. Drakos,*
  140 F.3d 129 (2d. Cir. 1998) ............................................................... 8

*Sieber & Calicutt, Inc. v. La Gloria Oil & Gas Co.,*
  66 S.W.3d 340 (Tex. App.—Tyler 2001, pet. denied) ............................. 2

*Simon v. Intercontinental Transport (ICT) B.V.,*
  882 F.2d 1435 (9th Cir. 1989) ........................................................... 15

*Tankship Int'l, LLC v. El Paso Merchant Engery–Petroleum Co.,*
  428 F. Supp. 2d 93 (D. Conn. 2006) .................................................... 8

*Theriot v. Bay Drilling Corp.,*
  783 F.2d 527 (5th Cir. 1986) ............................................................... 6

*Trafikaktiebolaget Grangesberg Okelosund v. Wilkens,*
  4 F.2d 577 (S.D. Tex.), *aff'd as modified on other grounds,*
  10 F.2d 129 (5th Cir. 1925) ............................................................... 13

*Upper Steamboat Co. v. Blake,*
  2 App. D.C. 51 (D.C. 1893) ............................................................... 17

## <u>Statutes and Rules</u>

28 U.S.C. § 1333.................................................................................................. 1, 3

FED. R. CIV. P. 12(B)(1) ...................................................................................... 1, 3

Defendants, Teichman Group, LLC and T&T Offshore, Inc. (collectively, "T&T") move the Court to dismiss this case for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure, because the contract upon which Plaintiffs' declaratory judgment claim is predicated is not a maritime contract and thus does not give rise to admiralty and maritime jurisdiction under 28 U.S.C. § 1333.

## NATURE AND STAGE OF THE PROCEEDING

This contractual indemnity dispute arises out of two wrongful-death actions and related bystander and injury claims brought against T&T by employees of OSG[1] or its contractors in connection with a crane accident that occurred on September 20, 2017 on premises leased by T&T to OSG in Galveston, Texas. T&T demanded defense and indemnity from OSG against those claims under standard knock-for-knock indemnity provisions contained in a Master Service Agreement (MSA) between OSG and T&T. OSG refused to defend or indemnify T&T, claiming that the MSA had expired and had not been renewed. T&T contends that the parties' continued performance under the terms of the MSA exactly as before the purported expiration evidenced the implied continuation of the MSA, including the indemnity provisions. Because of OSG's surprise disavowal of the MSA, T&T was forced to defend and settle the death and injury claims brought by OSG employees (some of which are continuing), for which T&T seeks full indemnity from OSG for the costs of defense and settlement of those claims, along with the attorneys' fees

---

[1] Plaintiff OSG Lightering LLC ("OSG") allegedly changed its name to Lightering LLC in 2017.

and other costs incurred in both defending those cases, and in prosecuting its demand for defense and indemnity.

OSG seeks a declaratory judgment that the terms of the MSA do not govern its relationship with T&T. OSG asserts that this Court has admiralty jurisdiction over this dispute based on its claim that the MSA is a maritime contract. The parties have exchanged initial disclosures, written discovery, and documents. No depositions have yet been taken.

The Court has bifurcated the case into two phases:

- Phase 1: the existence and enforceability of the MSA's defense and indemnity terms (necessarily including T&T's jurisdictional challenge, followed, if necessary, by a determination of the applicable governing law);[2] and

- Phase 2: damages.

Docket call is set for December 14, 2018.

## ISSUE, BURDEN OF PROOF, & STANDARD OF REVIEW

***Issue: Does the Court have subject-matter jurisdiction?*** The threshold issue is whether the MSA is a maritime contract sufficient to support the invocation

---

[2] Even if this Court determines that the MSA is a maritime contract, it does not follow that maritime law governs the question of whether the parties impliedly extended the MSA and/or its terms and conditions through their conduct. Rather, the question of which law governs is a complicated one that will require extensive briefing. T&T expects to be able to show that, whether Texas law or maritime law applies, both support the conclusion that the parties extended the MSA's terms through their continued performance after the expiration date. *Compare Sieber & Calicutt, Inc. v. La Gloria Oil & Gas Co.*, 66 S.W.3d 340, 347 (Tex. App.—Tyler 2001, pet. denied)(contract was extended by continued performance; indemnity applied) *and ALCOA v. Hydrochem Indus. Services, Inc.*, 2005 WL 608232 (Tex. App.—Corpus Christi 2005, pet. denied), *with In re Gingrich*, 2011 WL 6001347 (D.N.J. 2011) (in maritime contract case, evidence showed an implied contract, including indemnity, after expiration). *See also Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909 (Tex. 2013) (where holdover tenant remains in possession and continues to pay rent, the terms of the prior lease will continue to govern).

of admiralty jurisdiction under 28 U.S.C. § 1333. If the MSA is not a maritime contract, the case must be dismissed for lack of subject-matter jurisdiction.

**Burden of Proof on OSG.** The burden of proof on a motion to dismiss for lack of subject matter jurisdiction is on OSG as the party asserting jurisdiction. The plaintiff bears the burden of proof that jurisdiction does in fact exist. *Alfonso v. United States*, 752 F.3d 622, 625 (5th Cir. 2014).

**Standard of Review.** This Court's legal determinations are reviewed *de novo* and any disputed factual findings are reviewed for clear error. *Id.*

## RULE 12(B)(1) STANDARD

Lack of subject matter jurisdiction may be found from: (1) the complaint alone, (2) the complaint supplemented by undisputed facts evidenced in the record, or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Barrera–Montenegro v. U.S.*, 74 F.3d 657, 659 (5th Cir. 1996). The Fifth Circuit recognizes two types of challenges to a court's subject-matter jurisdiction—facial attacks and factual attacks. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). When a defendant files a 12(b)(1) motion unaccompanied by supporting evidence, it is considered a facial attack and the court merely looks to the sufficiency of the allegations in the complaint. *Id.* In a factual attack on subject-matter jurisdiction, as with this Motion, the defendant submits affidavits, testimony or other evidentiary materials. *Id.* When resolving factual challenges to subject matter jurisdiction, the court has discretion to review documents outside of the pleadings. *Clark v. Tarrant Cnty., Tex.*, 798 F.2d 736, 741 (5th Cir. 1986). The

question of subject matter jurisdiction is for the court to decide, even if the question hinges on legal or factual determinations. *Barrera–Montenegro*, 74 F.3d at 659.

OSG alleges that this is a case of admiralty and maritime jurisdiction "because the claims at issue involve alleged defense, indemnity and insurance obligations in a maritime contract." (Doc. 3, First Amended Complaint, at 2, ¶ 6.) OSG does not explain or support its allegation that the MSA is a "maritime contract," as is its burden. Parties who seek to invoke the jurisdiction of the federal courts have the duty to establish jurisdiction by affirmatively alleging in their complaints, the facts conferring jurisdiction; conclusory allegations are insufficient. *Gaar v. Quirk*, 86 F.3d 451, 453 (5th Cir. 1996); *Lowe v. Ingalls Shipbuilding*, 723 F.2d 1173, 1176–77 (5th Cir. 1984).

## SUMMARY OF THE ARGUMENT

The Fifth Circuit's recent *en banc* decision in *In re Larry Doiron, Inc.*, 879 F.3d 568, 574 (5th Cir. 2018)[3] simplified and brought clarity to the test for maritime contracts in the context of multi-faceted master services agreements such as the one at issue here. *Doiron* was in turn guided by the Supreme Court's decision in *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 24, 125 S. Ct. 385, 393 (2004), which itself substantially clarified the test. Together, *Kirby* and *Doiron* require an analysis of what the parties agreed to provide each other, and what was actually provided, and whether either agreed to provide a vessel to the other, or to perform substantial work from a vessel.

---

[3] Petition for Writ of Certiorari filed, No. 17-1420; 2018 WL 1757760 (U.S. Apr. 5, 2018).

The MSA at issue is not a maritime contract because neither party agreed to furnish a vessel to the other, or to perform work from a vessel for the other. Instead, the MSA provides for a mix of property and services, the clear majority of which were non-maritime in nature – chiefly (1) a lease of real property (an office, warehouse, parking, outside storage, and dock space) and (2) provisions for labor and equipment services, including a small amount of maritime services in the form of vessel loading and unloading. Because the maritime services that T&T provided to OSG (loading and unloading of vessels) were incidental—whether measured by space, time and/or money—the MSA was not a maritime contract and this Court lacks subject-matter jurisdiction.

## ARGUMENT AND AUTHORITIES

**I.      This case does not fall within the Court's admiralty jurisdiction and should be dismissed.**

      **A.      A contract is not a maritime contract unless its principal objective is maritime commerce and it calls for substantial work to be performed from a vessel.**

The Supreme Court and the Fifth Circuit, sitting en banc, have brought much needed clarity to the question of whether a contract is a maritime contract. In *Kirby*, the Supreme Court emphasized that the central focus of the inquiry is "whether the principal objective of [the] contract is maritime commerce," 543 U.S. at 25, i.e., whether the "nature and character of the contract" has "reference to maritime service or maritime transactions." *Id.* at 24.

Building on *Kirby*'s analysis, the Fifth Circuit in *Doiron*, sitting en banc, held that in determining whether a contract is maritime for purposes of admiralty jurisdiction, "the focus should be on whether the contract calls for substantial work

to be performed from a vessel." 879 F.3d at 573.[4] Courts are to examine "evidence of the work actually performed and the extent of vessel involvement in the job." *Id.* at 577. While *Doiron* was focused on contracts involving oil and gas production on navigable waters, the Fifth Circuit emphasized that its analysis regarding vessel involvement was not limited to this context.[5]

**B.    The MSA itself, the parties' course of performance, and OSG's own descriptions of the MSA, demonstrate that the principal objective of the MSA was not maritime commerce.**

As shown below, when both the terms of the MSA and the parties' performance under the MSA are examined, most of the parties' performance—as measured by money, space, and time—was not vessel-related, and was instead related to land, buildings, and non-maritime services. Thus, the principal objective of the MSA was not maritime commerce.

---

[4] It has long been the case that not every contract that touches incidentally on maritime activities is a maritime contract; for maritime character to attach, "there must be a direct and proximate juridical link between the contract and the operation of a ship." *J.A.R., Inc. v. M/V Lady Lucille*, 963 F.2d 96, 98 (5th Cir. 1992) (citing *Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 538 (5th Cir. 1986)). To determine whether a contract is maritime, courts have looked to whether the "nature of the transaction was maritime" and "whether the services performed under the contract are maritime in nature." *Gulf Coast Shell & Aggregate LP v. Newlin*, 623 F.3d 235, 240 (5th Cir. 2010) (citing *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 611, 612, 111 S.Ct. 2071 (1991)); *accord Adams Offshore Ltd. v. OSA Int'l, LLC*, 2011 WL 4625371 at *16 n.4 (S.D. Tex. 2011). As shown below, leases of dock or wharf space are not maritime contracts where, as here, the dock is not dedicated to specific vessels, and rent is paid regardless of whether a vessel is present at the dock.

[5] The Fifth Circuit explained: "If an activity in a non-oil and gas sector involves maritime commerce and work from a vessel, we would expect that this test would be helpful in determining whether a contract is maritime." 879 F.3d at 577, n.52. It also reviewed other circuits' treatment of *Kirby* in a variety of other contractual settings, including insurance contracts, and concluded that those circuits' "approaches in those decision[s] are not inconsistent with this [vessel] test." *Id.* at 576, n.49.

1.     **The MSA involved the provision of leased space and services that were mostly non-maritime in nature.**

Most of what T&T agreed to provide OSG under the MSA was for rental of real property, including:

- Storage space for OSG's equipment on land and parking for OSG's personnel, representatives and customers (49,300 square feet);[6]

- Wharf space of 200 feet for up to three of OSG's chartered workboats;[7] and

- Approximately 5,000 square feet of warehouse for OSG's use (with the wharf space, storage, parking, and warehouse space referred to as the "Facilities," described as "located on Pelican Island in the Port of Galveston, also known as 2915 Todd Road").[8]

T&T also agreed to provide dockside services, including labor for loading and discharging equipment from OSG's supply boats and general (landside) repairs to OSG's equipment. The required labor was charged at $45 per hour,[9] the forklift services were charged at $50 per hour,[10] and a large crane and forklift were charged at $175 per hour.[11] OSG did not permit T&T employees on its vessels. *See* Exhibit A at p. 3 , ¶ 7.

In return OSG agreed to pay:

- $16,500 per month to T&T;[12]

---

[6] *See* MSA, Exhibit 1 to Exhibit A (Declaration of Kevin Teichman), at p. 2, ¶ 2(a)(emphasis added).

[7] *Id.*

[8] *Id.*

[9] *Id.* at p. 3, ¶ 2(b).

[10] *Id.*

[11] *Id.*

[12] *Id.* at p. 2, ¶ 2.

- for all utility services for the Facility, including, but not limited to, electric, water, phone, gas etc.;[13]

- all costs and expenses for fencing/enclosing the storage area;[14]

- all costs and expenses for the build-out of its office, area including utilities[15]; and

- for usage of the above-described equipment and labor.

### 2. The parties' course of performance under the MSA involved mostly non-maritime services.

The parties' actual course of performance under the MSA—whether measured by space, money, or time—also involved primarily non-maritime services.

### a. Services measured by space: mostly (74%) non-maritime

Following is an aerial photograph of the Pelican Island premises, with the areas leased and used by OSG highlighted in yellow:[16]

---

[13] *Id.* at p. 4, ¶ 3(a).

[14] *Id.* at p. 4,¶ 3(b).

[15] *Id.* at ¶ 3(c). The parties also agreed that T&T would market and/or broker and occasionally use OSG's vessels when they were not otherwise engaged in OSG's business. Such agreements have been held to be non-maritime contracts. *See, e.g., Harley Mullion & Co. Ltd. v. Caverton Marine Ltd.*, 2008 WL 4905460, *3 (S.D.N.Y. 2008); *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 134 (2d. Cir. 1998); *Maritima Petroleo E Engenharia LTDA v. Ocean Rig 1 AS*, 78 F. Supp. 2d 162, 170 (S.D.N.Y. 1999); *Tankship Int'l, LLC v. El Paso Merchant Engery–Petroleum Co.*, 428 F. Supp. 2d 93, 99 (D. Conn. 2006); *Boyd, Weir & Sewell, Inc. v. Fritzen-Halcyon Lijn, Inc.*, 709 F. Supp. 77, 79 (S.D.N.Y. 1989). The MSA also includes various additional ancillary agreements not pertinent here.

[16] A full-sized copy of this picture is attached and incorporated as Exhibit 2 to the Declaration of Kevin Teichman, which is attached and incorporated herein by reference as Exhibit A.

8



This Exhibit shows that the clear majority of the real property used by OSG (about 74%) was for outside storage, parking, office, and warehouse space. OSG engages in transferring petroleum products between shuttle vessels and large tanker vessels in the Gulf of Mexico. OSG did not bring actual tanker or shuttle vessels to Pelican Island premises; even its smaller shuttle ships were too large and/or deep drafted to come in to T&T's premises on Pelican Island. The only vessels OSG occasionally brought to Pelican Island were smaller supply boats that carried the fenders and hoses offshore for lightering support. *See* Exhibit A at page 3 ¶ 8.

### b. Services measured by money: mostly (84%) non-maritime

Of all amounts paid by OSG to T&T in the almost-five-year period leading up to the incident (a total of approximately $1,307,887.83), an approximate maximum of $204,695.00 or 15.65% was for the only maritime service that T&T provided to OSG under the MSA: vessel loading and unloading services.[17] The remaining $1,103,192.83 charged by T&T (84.35% of all charges) was for rental of real property and provision of various non-maritime services. A chart of the respective charges follows:



<hr />

[17] Contracts relating purely to the loading or unloading of vessels have been held to be maritime. *See, e.g., A/S J. Ludwig Mowinckels Rederi v. Commercial Stevedoring Co.*, 256 F.2d 227 (2d Cir. 1958).

A full-sized copy of this chart is attached as Exhibit 3 to Exhibit A. A summary of the various charges by month is attached and incorporated herein by reference as Exhibit 4 to Exhibit A.

     **c.**    **Services measured by time: mostly (88%) non-maritime**

During the same five years leading up to the incident, from February 1, 2013 to August 31, 2017 (1,672 days), in this seven-day-a-week business, T&T only participated in loading or unloading OSG's vessels on 199 days or 11.9% of the time OSG occupied the premises. A graphic depiction of the relatively few days on which T&T loaded or unloaded OSG vessels is set forth below:



A full-sized chart, together with yearly summaries, is attached as Exhibit 5 to Exhibit A.

### 3.    OSG treated the MSA as a lease of real property.

Finally, OSG's own descriptions of the MSA indicate that it understood it to be a primarily a lease of real property. *Cf. Icon Amazing LLC v. Amazing Shipping, Ltd.*, 951 F. Supp. 2d 909, 913-14, 917 (S.D. Tex. 2013) (plaintiff's own description of the contract as a vessel sale/financing, not as a conventional maritime charter, supported the court's conclusion that it was not a maritime contract). For example, OSG referred to Pelican Island as a "leased facility" in its most recent annual report to its shareholders:[18]

> *The Company may be subject to litigation and government inquiries or investigations that, if not resolved in the Company's favor and not sufficiently covered by insurance, could have a material adverse effect on it.*
>
> The Company has been and is, from time to time, involved in various litigation matters and subject to government inquiries and investigations. These matters may include, among other things, regulatory proceedings and litigation arising out of or relating to contract disputes, personal injury claims, environmental claims or proceedings, asbestos and other toxic tort claims, employment matters, governmental claims for taxes or duties, and other disputes that arise in the ordinary course of the Company's business. For example, in late September 2017, an industrial accident at a leased facility in Galveston resulted in fatalities to two temporary employees. In accordance with law, an investigation of the accident is currently underway, and filed lawsuits have identified several defendants, including a subsidiary of the Company. The Company believes it is too early to determine what, if any, effect the outcome of this matter will have on us.

OSG also described its interest in the Pelican Island property as "Field Office/Warehouse Equipment Storage" (e.g., not as a dock or wharf) in its insurance property schedule:[19]

---

[18] True and correct copies of excerpts of this Annual Report are attached as Exhibit 1 to Exhibit B.

[19] True and correct copies of excerpts of OSG's Insurance Policy, as produced by OSG, are attached as Exhibit 2 to Exhibit B.

**SCHEDULED LOCATIONS**

| LOCATION | ADDRESS | DESCRIPTION |
|---|---|---|
| | **DOMESTIC** | |
| California | 971 S. Seaside Ave<br>Terminal Island, CA  90731 | Equipment Storage (Houston Lightering) |
| Louisiana | Martin Terminal North<br>120 17th Street<br>Port Fourchon, LA  70357 | Equipment Storage (Houston Lightering) |
| New York | 600 Third Ave, 39th Floor<br>New York, NY  10019 | Corporate Headquarters |
| | Miller's Launch Pier 7 ½<br>Staten Island NY | Field Office (Houston Lightering) |
| Texas | 1001 Woodloch Forest Dr., Suite325<br>The Woodlands, TX  77380 | Office |
| | 2915 A Todd Road<br>Galveston TX 77554 | Field Office/Warehouse Equipment Storage<br>(Houston Lightering) |
| | Able Infosat Communications, Inc.<br>5906 Broadway<br>Pearland TX  77581 | Warehouse (IS Group) |
| | **FOREIGN** | |

### C. The fact that OSG contracted for wharf space does not render the MSA a maritime contract.

OSG has suggested that because the MSA includes an obligation for T&T to provide wharf space, it is a "contract for wharfage"[20] and thus is a maritime contract. This is incorrect. Numerous cases distinguish between: (1) contracts for wharfage, in which wharf space is provided to a *specific* vessel for a *limited* period *based on the credit of that vessel*, so as to give rise to a maritime lien; and (2) longer term lease contracts for land such as the MSA, which include some wharf space for *non-specific* vessels, *for which rent is paid regardless of the presence of a vessel*. The former are maritime contracts; the latter are not.

Several decisions from district courts in this Circuit illustrate this point. In *Jaspriza v. Schlumberger Tech. Corp.*, 2010 WL 4879442 (E.D. La. 2010), the court held that a lease of land fronting on a navigable canal—which provided space for dockage of the lessee's vessels and the loading and unloading of the crews and their

---

[20] The terms "dockage" and "wharfage" are synonymous and are used interchangeably. *Trafikaktiebolaget Grangesberg Okelosund v. Wilkens*, 4 F.2d 577, 580 (S.D. Tex.), *aff'd as modified on other grounds*, 10 F.2d 129 (5th Cir. 1925).

13

necessary clothing, gear, and provisions—was not a maritime contract. The court held that the lease of a wharf or dock does not fall within admiralty jurisdiction unless the contract specifies a particular vessel, citing numerous federal appellate and district court decisions in support. *Id.* at *1.[21]

Likewise, in *Constantin Land Trust v. Epic Diving and Marine Services, LLC*, 2013 WL 1292275 (E.D. La. 2013), the court held that it lacked admiralty jurisdiction over a contract dispute involving a tract of land that included a dock. The court rejected the third-party defendant's assertion that the presence of the dock and its related customer contracts for the provision of water, supplies, loading, repairing, docking and mooring of vessels on a navigable waterway, were sufficient to trigger admiralty jurisdiction. Citing extensive case law involving agreements relating to docks, the court emphasized that neither the location of the leased properties on a navigable waterway nor the presence of a dock was determinative. Instead, because the lease did not mention any particular dock or vessel, and reading the agreement as a whole, the court concluded that the primary objective of the contract was the lease of real property. 2013 WL 1292275 at *10-11.[22]

---

[21] The court cited: *Royal Ins. Co. v. Pier 39 Ltd.*, 738 F.2d 1035, 1037-38 (9th Cir. 1984) ("Wharfage contracts are maritime if wharfage is provided to a specific vessel."); *Goodman v. 1973 26 Foot Trojan Vessel*, 859 F.2d 71, 73 (8th Cir. 1988) ("Contracts, such as this one, providing wharfage to a particular vessel are maritime."); *Proleride Transp. Sys., Inc. v. Union Carbide Corp.*, 498 F. Supp. 680 (D. Mass. 1980); *Gowanus Storage Co. v. U.S. Shipping Bd. Emergency Fleet Corp.*, 271 F. 528, 530 (E.D.N.Y. 1921)("[A] lease of a wharf is not a maritime contract on which may be maintained an action in admiralty for the collection of rent.").

[22] *See also Beyel Bros., Inc. v. Canaveral Port Authority*, 2006 WL 2864387, at *2 (M.D. Fla. 2006) (statements in contracts that the subject land would be used to moor tugboats did not make the contracts maritime because, in reality the contracts were simply "land use contracts." "The parties understood that maritime activity would be performed on the land,

Both *Jaspriza* and *Constantin Land Trust* relied on the Eastern District of Louisiana's earlier decision in *Buck Kreihs Co., Inc. v. Board of Commissioners of Port of New Orleans*, 1997 WL 666220 (E.D. La. 1997), which also involved a dispute about the lease of a wharf. The *Buck Kreihs* court likewise held, after an extensive review of the case law, that a contract to lease a wharf is generally not considered a maritime contract for purposes of federal jurisdiction unless tied to a particular vessel. 1997 WL 666220 at *2 (citing, *inter alia*, *Simon v. Intercontinental Transport (ICT) B.V.*, 882 F.2d 1435, 1441 (9th Cir. 1989) (lease of a pier or wharf is not a maritime contract unless the lease is tied to the provision of wharfage for a specific vessel)).

Cases from outside the Circuit also emphasize the distinction between wharfage contracts and leases of land that include dock space. For example, in *Dockside Dev. Corp. v. Ill. Int'l Port Dist.*, 479 F. Supp. 2d 842 (N.D. Ill. 2007), the court held that it had no admiralty jurisdiction over a dispute involving the lease of a premises operated as a public port and terminal facility. That court noted that while contracts for "wharfage" are maritime, the definition of wharfage is "the fee charged for the temporary use of a dock furnished in the ordinary course of navigation to a ship for the purpose of mooring in safety in order to load and unload cargo, to receive and land passengers, to make temporary repairs and to refuel, resupply and reprovision," in contrast to a long term lease of land that includes dock space. 479 F. Supp. 2d at 847.

---

and the contracts contained language intended to regulate that activity. But such activity is peripheral to the central purpose of these contracts.")

Likewise, the Sixth Circuit, after reviewing case law dealing with "wharves and dry docks," concluded that there was "a conceptual distinction between a contract relating to a particular vessel involved in a commercial operation as opposed to the overarching operation of a fixed structure that happens to involve boats." *New Hampshire Ins. Co. v. Home Sav. & Loan Co. of Youngstown, OH*, 581 F.3d 420, 431 (6th Cir. 2009) (holding that insurance policy covering a yacht dealership and a marina was not a maritime contract, despite the fact that some of the services provided by the marina related incidentally to or facilitated maritime commerce).

Many of these decisions can be traced to the seminal, oft-cited cases of *The James T. Furber*, 129 F. 808 (D. Me. 1904) and *Empire Warehouse Co. v. The Advance*, 60 F. 766 (D. Mass. 1894). The contract at issue in *The James T. Furber* provided the lessee with the use of a landing on a wharf and for room on the wharf for the building of a waiting room. The plaintiff landlord sued for overdue rent. The court explained that "wharfage" is the use of a wharf furnished in the ordinary course of navigation, which would be a maritime contract. But the court noted a "distinct difference between a claim for 'wharfage' and a claim for 'rent of a wharf.'" 129 F. at 810. Under the lease in question, rent was payable whether or not a vessel came to the wharf. Thus, the contract arose out of the relation of landlord and tenant, was in form and substance a lease of real estate, and could not be enforced by the admiralty court. *Id*.

Similarly, in *Empire Warehouse*, the court recognized that maritime liens for wharfage arise when the wharfage is obtained in the ordinary course of navigation,

on the engagement of the master or officers of the ship. The court found that the wharfage in question was not furnished in the ordinary course of navigation, nor upon the request or upon any contract of the master or any other officer of the ship. Instead, as in this case, it was furnished in accordance with the terms of an agreement between the landowner and the vessel owner years before. The agreement provided for the payment of $30 a day for the entire use of the pier for loading and discharging of cargo, and for receiving and storing freight on the pier and warehouses on the property. The court found that the agreement "embraced considerably more than ordinary wharfage rights" at higher than normal rates, "evidently in consideration of the storage and other facilities offered." 60 F. at 768. The court found that the contract was for the exclusive use of the wharf, and a partial use of the warehouse, rather than for mere ordinary wharfage of steamers. Because the dealings were upon a personal contract between the two companies, which did not look to any credit of the ship, but only to the personal responsibility of the steamship company, it was not a maritime contract. *Id*. This case is directly on point here.[23]

---

[23] *See also Upper Steamboat Co. v. Blake*, 2 App. D.C. 51, 56-57 (D.C. 1893)(while wharves, piers, and docks are essential as means of conducting maritime trade and commerce, it does not follow that all contracts relating to them are maritime contracts; there is an essential difference between a contract for wharfage, and a contract for rent of a wharf, which creates the relation of landlord and tenant, and under which rent is payable whether or not a vessel actually docks at the wharf, and which is not a maritime contract, but is a contract relating to realty).

**D.    The fact that a small portion of the MSA involved vessel loading or unloading or the lease of dock space does not render the MSA a maritime contract.**

The fact that the MSA provided for some incidental vessel loading and unloading services and for some dock space also does not render the MSA a maritime contract. As noted above, the test is "whether the ***principal*** objective of [the] contract is maritime commerce." *Kirby*, 543 U.S. at 25 (emphasis added). And in this Circuit, "whether the contract calls for substantial work to be performed from a vessel," *Doiron*, 879 F.3d at 573, is a key factor in the analysis—one that calls for an comparison between vessel-based and non-vessel-based contractual duties. *Id.* at 576 n.47 ("When work is performed in part on a vessel and in part on a platform or on land, we should consider not only time spent on the vessel but also the relative importance and value of the vessel-based work to completing the contract.")

*Kirby* presupposes that contracts can have primary objectives that are non-maritime and secondary objectives that are maritime (and vice versa). Before *Doiron*, the Fifth Circuit held that such "mixed contracts" are considered non-maritime unless "the contract is primarily maritime and the non-maritime elements of the contract are *incidental* to that *primary purpose*," *Alphamate Commodity GMBH v. CHS Europe SA*, 627 F.3d 183, 187 (5th Cir. 2010) (emphasis added), an analysis consistent with the "principal objective" test in *Kirby*.[24]

_____

[24] The *Doiron* Court articulated two criticisms of the "mixed contract" line of cases. First, it suggested that *Kirby* had overruled an aspect of this theory by which courts could sever and separately enforce maritime obligations in mixed contracts via admiralty jurisdiction. 879 F.3d at 575. Second, it repeated *Kirby*'s rejection of a geographical application of the test. *Id.* Neither of these criticisms is relevant here. *Kirby*, *Alphamate*, and *Doiron* all provide

As explained above, even if the MSA is considered a "mixed contract," the conclusion that its primary purpose was non-maritime is inescapable, and that any maritime elements were merely incidental. This is confirmed by several well-reasoned decisions where courts have refused to exercise admiralty jurisdiction over analogous contracts.

For example, in *Board of Commissioners of Orleans Levee Dist. v. M/V Belle of Orleans*, 535 F.3d 1299 (11th Cir. 2008), the Levee Board leased land, including dock space, to a specific casino boat. In addition to the dock space, the leased land included a parking lot, storage areas, and a terminal building. Because the lease referenced a specific vessel in relation to the dock space, the court found it analogous to "wharfage" and thus maritime in nature; however, the dock space made up less than 5% of the total land leased under the Agreement. The Eleventh Circuit agreed with the district court that the rest of the contract, which related to parking lots, etc., had no maritime flavor. Thus, although the Agreement referenced a specific vessel, it was not a maritime contract giving rise to a maritime lien, and maritime jurisdiction did not exist. 535 F.3d at 1313-16. In this case, the contract does not specify a particular vessel or vessels, and is thus has even less of a maritime character. And like the contract at issue in the *Belle of Orleans* case, the vast majority of the property falling under the MSA is non-maritime, e.g., parking lot, outside storage, office space, and warehouse space.

---

that the Court must evaluate and compare the maritime and non-maritime elements of the MSA in ascertaining the parties' primary objective.

Similarly, in *Capital Yacht Club v. Vessel Aviva*, 409 F. Supp.2d 1 (D.D.C. 2006), the court concluded that a contract between a yacht club and the owners of a vessel (AVIVA), under which the owners paid the club $260 per month in exchange for dockage and various other services, did not give rise to admiralty jurisdiction. The club had claimed that the contract was maritime in nature because it provided dockage, electrical supply and other services vital to the vessel that constitute the provision of necessaries under maritime law. *Id.* at 3. But the court emphasized that the agreement also contained provisions concerning the board of directors' duties, clubhouse usage, parking, and several other provisions pertaining to the general operation of the yacht club. Indeed, numerous provisions of the agreement did not relate to maritime issues whatsoever. *Id.* at 8-9. Because the non-maritime elements of the contract were not merely incidental to the rest of the contract, the Court held that there was no admiralty jurisdiction and dismissed the case. The same is true here. The non-maritime elements of the MSA are substantial: 84% of the amounts OSG paid to T&T related to non-maritime services, and on 88% of days, no maritime services were provided to OSG. *See* Exhibits 2 and 3 to Exhibit A.

Another analogous case is *Inbesa America, Inc. v. M/V Anglia*, 134 F.3d 1035 (11th Cir. 1998), a dispute over a "Stevedoring and Terminal Services Contract," in which the plaintiff (INBESA) sued a vessel and its charterer, asserting a maritime lien for unpaid invoices for (1) dockage, (2) stevedoring, (3) unloading cargo, (4) stuffing and stripping cargo, (5) securing cargo, and (6) wharfage. The Eleventh Circuit noted that of these claimed services, only two—dockage and stevedoring— were clearly maritime. 134 F.3d at 1037. But the court found that the remaining

categories of services provided by M/V INBESA were non-maritime cargo-handling: "it has long been the rule that contracts involving cargo are maritime only to the extent the cargo is on a ship or being loaded on or off a ship." *Id.* All of INBESA's cargo-handling services took place on land without regard to whether the vessel ANGLIA was in port. In this case, T&T did some actual vessel loading/unloading for OSG, but only 16% of what OSG paid T&T was for such services, which were only provided on 12% of days during the last five years of the parties' relationship.

As shown above, the primary objective of the MSA is a lease of real property, not maritime commerce, and the MSA does not call for any substantial work to be performed from a vessel. Accordingly, under *Kirby* and *Doiron*, the MSA is not a maritime contract and does not give rise to admiralty jurisdiction.

## CONCLUSION

Contrary to OSG's counsel's statements at the initial conference in this matter, the MSA is not a contract for "wharfage." The cases cited above make clear that contracts for leases of land, which include dock space, are not maritime wharfage contracts where, as here, (1) dock space is not provided to specific vessels at the request of their officer; and (2) rent is paid whether or not vessels are present at the dock. Nor did the MSA involve storage of "cargo" or "appurtenances" of vessels as defined in maritime cases, as claimed by OSG. While the stevedoring services contemplated in and performed under the contract are maritime in nature, the evidence shows that those services amounted to only 16% of what OSG paid for under the MSA, and they were rendered on only 12% of days. Under the guidance provided in *Doiron* and *Kirby* and the long history of treatment of similar contracts,

the MSA is not a maritime contract, and does not provide admiralty jurisdiction over this dispute. Accordingly, T&T respectfully submits that this case should be dismissed for lack of subject matter jurisdiction.

Respectfully submitted,

**SCHOUEST BAMDAS SOSHEA & BENMAIER PLLC**

*/s/ Susan Noe Wilson*
**SUSAN NOE WILSON**
Texas Bar No.: 15055025
snoewilson@sbsblaw.com
1001 McKinney Street, Suite 1400
Houston, Texas 77002
Telephone: (713) 588-0446
Facsimile: (713) 574-2942
**ATTORNEY IN CHARGE FOR TEICHMAN GROUP, LLC AND T&T OFFSHORE, INC.**

OF COUNSEL:

**SCHOUEST BAMDAS SOSHEA & BENMAIER PLLC**

MICHAEL HOGUE
Texas Bar No.: 09809800
mhogue@sbsblaw.com
M. LANE LOWREY
Texas Bar No.: 24013065
llowrey@sbsblaw.com
1001 McKinney Street, Suite 1400
Houston, Texas 77002
Telephone: (713) 588-0446
Facsimile: (713) 574-2942

22

**HALL MAINES LUGRIN, PC**

CLAUDE L. STUART III
Texas Bar No. 19426620
cstuart@hallmaineslugrin.com
EVAN T. CAFFREY
Texas Bar No. 03588650
ecaffrey@hallmaineslugrin.com
Williams Tower
2800 Post Oak Blvd., 64th Floor
Houston, Texas 77056
Telephone: (713) 871-9000
Facsimile: (713) 871-8962

**HAYNES AND BOONE, LLP**

LYNNE LIBERATO
S.D. No. 3072
Texas Bar No. 00000075
lynne.liberato@haynesboone.com
MARK TRACHTENBERG
S.D. No. 24584
Texas Bar No. 24008169
mark.trachtenberg@haynesboone.com
1221 McKinney, Suite 2100
Houston, Texas 77010-2007
Telephone: (713) 547-2000
Facsimile: (713) 547-2600

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing document was served on all counsel of record on May 7, 2018, in accordance with the Federal Rules of Civil Procedure as follows:

Michael K. Bell
David G. Meyer
Blank Rome LLP
717 Texas Avenue, Suite 1400
Houston, Texas 77002
mbell@blankrome.com
dmeyer@blankrome.com

Harold K. Watson
Lisa M. Kaufmann
Chaffe McCall, LLP
801 Travis Street, Suite 1910
Houston, Texas 77002
watson@chaffe.com
kaufmann@chaffe.com

/s/ Susan Noe Wilson
SUSAN NOE WILSON