**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| LIGHTERING LLC, STARR INDEMNITY | § | |
| & LIABILITY COMPANY, and AGCS | § | |
| MARINE INSURANCE COMPANY, | § | |
| | § | Case 4:17-cv-03374 |
| Plaintiffs, | § | |
| | § | Filed under Rule 9(h) Fed. R. Civ. P. |
| v. | § | |
| | § | (ADMIRALTY) |
| TEICHMAN GROUP, LLC, and | § | |
| T&T OFFSHORE, INC., | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS UNDER RULE 12(B)(1) FOR LACK OF SUBJECT-MATTER JURISDICTION**

Michael K. Bell
David G. Meyer
Blank Rome LLP
717 Texas Avenue, Suite 1400
Houston, Texas 77002
(713) 402-7630
mbell@blankrome.com
dmeyer@blankrome.com

*Attorneys for Lightering LLC*

Harold K. Watson
Lisa M. Kaufmann
Chaffe McCall, L.L.P.
801 Travis Street, Suite 1910
Houston, Texas 77002
(713) 402-7630
watson@chaffe.com
kaufmann@chaffe.com

*Attorneys for Starr Indemnity & Liability
Company, AGCS Marine Insurance Company
marketed as Allianz Global Corporate &
Specialty, and XL Specialty Insurance
Company*

# TABLE OF CONTENTS

**Page**

I.  SUMMARY OF PLAINTIFFS' RESPONSE ...................................................1

II.  SUMMARY OF THIS ACTION ...........................................................2

III.  FACTUAL BACKGROUND ..............................................................2

    A.  The Accident at Issue ...............................................................2

    B.  The Contract at Issue ...............................................................7

IV.  ARGUMENT/AUTHORITIES ...........................................................11

    A.  Standard of Review ................................................................11

    B.  Plaintiffs' Complaint Sufficiently Plead Subject-Matter Jurisdiction ..................12

    C.  The MSA is a Maritime Contract ....................................................13

        1.  "Services From a Vessel" is not a Necessary Element of a Maritime Contract ...............................................13

        2.  The MSA is a Maritime Contract Because its Objective is Maritime Commerce and it has Reference to Maritime Services .............16

    D.  The MSA is not a "Lease of Real Property" ..........................................19

        1.  In Form and Substance, the MSA is a Contract for Services, Not a Lease ...............................................19

        2.  Defendants' Cited Authorities are Distinguishable from the Facts of this Case ..................................................24

V.  CONCLUSION ......................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A/S J. Ludwig Mowinckels Rederi v. Commercial Stevedoring Co.*,
    256 F.2d 227 (2d Cir. 1958) ................................................................16

*Am. E. Dev. Corp. v. Everglades Marina, Inc.*,
    608 F.2d 123 (5th Cir. 1979) ............................................................18

*AXA Re Prop. & Cas. Ins. Co. v. Tailwalker Marine, Inc.*,
    C.A. 2:04-1684-23, 2004 WL 3680276 (D.S.C. Dec. 17, 2004) ...........................19

*Baker Oil Tools, Inc. v. Delta S. S. Lines, Inc.*,
    562 F.2d 938 (5th Cir. 1977) ............................................................19

*Bombardier Aerospace Employee Welfare Benefits Plan v. Ferrer, Poirot & Wansbrough*,
    354 F.3d 348 (5th Cir. 2003) ............................................................11

*Channette v. Neches Gulf Marine, Inc.*,
    440 Fed. Appx. 258 (5th Cir. 2011) .....................................................7

*Constantin Land Trust v. Epic Diving and Marine Services, LLC*,
    2013 WL 1292275 (E.D. La. 2013) .......................................................25

*Corbitt v. Diamond M. Drilling Co.*,
    654 F.2d 329 (5th Cir. 1981) ............................................................20

*Diesel Repower, Inc. v. Islander Invs., Ltd.*,
    2002 AMC 751, 755 F.3d 1318 (11 Cir. 2001) ............................................19

*Ex parte Easton*,
    95 U.S. 68 (1877) ......................................................................17

*Ellison v. Charbonneau*,
    101 S.W.2d 310 ........................................................................22

*Exxon Corp. v. Central Gulf Lines, Inc.*,
    500 U.S. 603 (1991) ...................................................................15

*Fireman's Fund Am. Ins. Co. v. Boston Harbor Marina, Inc.*,
    406 F.2d 917 (1st Cir. 1969) ...........................................................19

*Flame S.A. v. Freight Bulk Pte. Ltd.*,
    762 F.3d 352 (4th Cir. 2014) .......................................................15, 24

*Folksamerica Reinsurance Co. v. Clean Water of New York,*
413 F.3d 307 (2d Cir. 2005).....................................................15, 17

*Garanti Finansal Kiralama S.A. v. Aqua Marine & Trading, Inc.,*
697 F.3d 59 (2d Cir. 2012)..............................................................12

*Garcia v. Copenhaver, Bell & Assocs.,*
104 F.3d 1256 (11th Cir. 1997) ......................................................12

*Great Lakes Reinsurance (UK) PLC v. Durham Auctions, Inc.,*
585 F.3d 236 (5th Cir. 2009) .............................................................7

*Griffin Indus., Inc. v. Foodmaker, Inc.,*
22 S.W.3d 33 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) ......................7

*H.E.Y. Tr. v. Popcorn Express Co., Inc.,*
35 S.W.3d 55 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) ....................22

*Icon Amazing, L.L.C. v. Amazing Shipping, Ltd.,*
951 F. Supp. 2d 909 (S.D. Tex. 2013) .............................................20

*In re Endeavor Marine Inc.,*
234 F.3d 287 (5th Cir. 2000) ..........................................................13

*In re Larry Doiron, Inc.,*
879 F.3d 568 (5th Cir. 2018), *cert. denied sub nom. Larry Doiron, Inc. v.*
*Specialty Rental Tools & Supply, L.L.P.*, 17-1420, 2018 WL 1763437 (U.S.
May 21, 2018)..........................................................................1, 13, 24

*Jaspriza v. Schlumberger Tech. Corp.,*
CIV. 10-1859, 2010 WL 4879442 (E.D. La. Nov. 23, 2010) ...............................25

*Loper v. Dufrene,*
84 Fed. Appx. 454 (5th Cir. 2004)....................................................21

*Mahony v. Lowcountry Boatworks, LLC,*
465 F. Supp. 2d 547 (D.S.C. 2006)....................................................15

*New Bedford Dry Dock Co. v. Purdy,*
258 U.S. 96 (1922)..........................................................................19

*New England Mutual v. Dunham,*
78 U.S. 1 (1870).......................................................................14-15

*Norfolk S. Ry. Co. v. Kirby,*
543 U.S. 14 (2004)..............................................1, 13, 14, 15, 16, 17, 24, 25

*North Pacific S.S. Co. v. Hall Bros. Shipbuilding*,
    249 U.S. 119 (1919) ................................................................................15

*Saudi v. S/T Marine Atl.*,
    159 F. Supp. 2d 492 (S.D. Tex. 2000) ....................................................16

*Selame Assoc., Inc. v. Holiday Inns, Inc.*,
    451 F.Supp. 412 (D.Mass. 1978) .............................................................18

*Sentry Select Ins. V. Royal Inc. Co. of America*,
    481 F.3d 1208 (9th Cir. 2007) .................................................................17

*Sisson v. Ruby*,
    497 U.S. 358 (1990) ...........................................................................17, 18

*Sphere Drake Ins. Co. v. La Gloria Oil & Gas Co.*,
    121 F.3d 705 (5th Cir. 1997) .....................................................................7

*St. Paul Fire & Marine Insurance Co. v. Board of Commissioners*,
    418 F.App'x 305 (5th Cir. 2011) .............................................................17

*T.N.T. Marine Serv., Inc. v. Weaver Shipyards & Dry Docks, Inc.*,
    702 F.2d 585 (5th Cir. 1983) ...................................................................12

*Thurmond v. Delta Well Surveyors*,
    836 F.2d 952 (5th Cir. 1988) ...................................................................14

*Toops v. Gulf Coast Marine, Inc.*,
    72 F.3d 483 (5th Cir. 1996) .................................................................21, 22

*Tremont LLC v. Halliburton Energy Services, Inc.*,
    696 F. Supp. 2d 741 (S.D. Tex. 2010) ....................................................20

*Young v. Vannerson*,
    612 F. Supp. 2d 829 (S.D. Tex. 2009) ....................................................12

**Statutes**

28 U.S.C. § 1333 .................................................................................2, 12, 25

**Other Authorities**

Bryan A. Garner, A Dictionary of Modern Legal Usage 514 (2d ed. 1995) ...............................21

FRCP 8 .................................................................................................12

FRCP 9(h) ............................................................................................12

FRCP 12(b)(1) ...............................................................................1, 2, 11

iv

# I.    SUMMARY OF PLAINTIFFS' RESPONSE

Plaintiffs Lightering LLC, Starr Indemnity & Liability Company, AGCS Marine Insurance Company marketed as Allianz Global Corporate & Specialty, and XL Specialty Insurance Company file this Response to Defendants T&T Offshore Inc. and Teichman Group, LLC's Motion to Dismiss Under Rule 12(b)(1) for Lack of Subject-Matter Jurisdiction (Dkt. 29) and submit that the Motion should be denied in its entirety because:

- Defendants incorrectly assert that a contract must "call for substantial work to be performed from a vessel" in order to be considered maritime. Instead, as was recognized by the Fifth Circuit in *Doiron*,[1] the US Supreme Court's *Norfolk v. Kirby* opinion[2] sets forth the applicable test for determining whether a contract is maritime, which is as follows:

    "To ascertain whether a contract is a maritime one, we cannot look to whether a ship or other vessel was involved in the dispute, as we would in a putative maritime tort case. Nor can we simply look to the place of the contract's formation or performance. Instead, the answer depends upon ... the nature and character of the contract, and the true criterion is whether it has reference to maritime service or maritime transactions."

- Under the *Kirby* test, the contract at issue is clearly maritime, as it called for T&T Offshore to provide services long considered maritime as a matter of law, including:

    o   wharfage/dockage for the chartered workboat vessels Lightering used in its offshore lightering operations;

    o   dockside storage for Lightering's equipment (fenders, hoses, and similar equipment necessary for lightering operations) during the temporary periods of time such equipment was not being used offshore; and,

    o   dockside services for loading and discharging the foregoing equipment to and from Lightering's vessels, as well as general repairs to such equipment and vessels as needed.

- Defendants' attempt to characterize the contract at issue as a non-maritime "lease of real property" ignores the language and substance of the contract, both of which, when set against the applicable jurisprudence, establish that it is a contract for maritime services, not a lease of real property.

---

[1] *In re Larry Doiron, Inc.*, 879 F.3d 568 (5th Cir. 2018), *cert. denied sub nom. Larry Doiron, Inc. v. Specialty Rental Tools & Supply, L.L.P.*, 17-1420, 2018 WL 1763437 (U.S. May 21, 2018).
[2] *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14 (2004).

## II.     SUMMARY OF THIS ACTION

This action concerns the T&T Defendants' claims against Lightering and its insurers for contractual defense, indemnity, and additional insured coverage for a variety of wrongful death and personal injury claims arising from an accident that occurred on September 20, 2017.[3] Plaintiffs filed this declaratory judgment action to resolve, among other issues, whether the T&T Defendants' claims are invalid due to the fact that they are based on a Master Services Agreement that expired by its own express terms two and a half years before the accident at issue.[4]

Plaintiffs initiated this action on November 6, 2017, contending, among other things, that this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1333 because the contract at issue is a maritime contract.  On February 21, 2018, the Court entered a scheduling order that included a deadline of April 20, 2018, for filing motions challenging subject-matter jurisdiction, which was subsequently extended to May 7, 2018.  The T&T Defendants have now filed a motion to dismiss for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), asserting that this Court does not have subject matter jurisdiction because the contract at issue is a non-maritime lease of real property.   By agreement of the parties, Plaintiffs' deadline to respond was extended to June 8, 2018, and Plaintiffs are filing this response brief in compliance with that deadline.

## III.     FACTUAL BACKGROUND

### A.     The Accident at Issue

The accident at issue occurred at the T&T Defendants' Pelican Island facility in Galveston, Texas, which is situated on land under long-term lease from the Board of Trustees of the Galveston

---

[3] *See* Plaintiffs' Second Amended Complaint [Doc. 16].
[4] Lightering and its insurers also reserved their right to challenge the reasonableness of settlements reached by T&T with wrongful death and personal injury claimants, as well as the fairness, adequacy, and reasonableness of all attorneys' fees and costs incurred by T&T, for which they are seeking to be reimbursed by Lightering and its insurers. *Id*. at p. 8, ¶¶ 20-21.

Wharves to T&T Marine Salvage, Incorporated, neither of which is a party to this action.[5]

Lightering, previously known as OSG Lightering LLC, is in the business of, among other things, conducting lightering operations, which generally involve transferring liquid cargoes between two or more vessels, in the Gulf of Mexico region.[6] An example of a lightering operation in progress is shown below:



Lightering is typically hired to handle all aspects of lightering operations, including providing Mooring Masters and Assistant Mooring Masters, who, similar to compulsory harbor pilots, board the two lightering vessels and provide the Master and crew of each vessel with expert advice, instructions, and recommendations on executing the lightering operation from start to finish.[7] Lightering also provides all of the necessary equipment for the lightering operation.[8] This equipment includes, but is not necessarily limited to, Yokohama fenders, which are only intended for use in water and are used to keep vessels safely separated during lightering and similar

---

[5] A copy of the lease agreement, which was obtained via a Texas Open Records Act request to the Port of Galveston, is attached hereto as Exhibit B. Plaintiffs are in the process of producing the entirety of the Port of Galveston's response, along with other materials, to the T&T Defendants.
[6] *See* Exhibit A, declaration of Clayton Wrenn, at ¶ 2 and ¶ 4.
[7] *See* Exhibit A, Wrenn declaration, at ¶ 5.
[8] *Id.* at ¶ 6.

operations, cargo transfer hoses, and associated cables and lines utilized by the chartered workboats and the lightering vessels.[9]

Additionally, Lightering utilizes chartered workboats, which are crewed by mariners specifically trained and experienced in conducting lightering operations.[10] The workboats are a critical component of lightering operations, as they transport, deploy, and retrieve the necessary equipment used in lightering, as well as carry Lightering's Mooring Masters and Assistant Mooring Masters to and from the lightering vessels.[11] An example of one such workboat, the *Elliott Cheramie*, is shown below[12]:



At the time of the accident, Lightering was utilizing T&T's facility for purposes of supporting Lightering's offshore lightering operations.[13] Generally, this involved Lightering's

---

[9] *See* Exhibit A, Wrenn declaration, at ¶ 6.
[10] *Id*. at ¶ 7.
[11] *Id*.
[12] This image was taken from video surveillance footage produced by the Galveston Police Department in response to a Texas Open Records Act request. Plaintiffs are in the process of producing the entirety of the Galveston Police Department's response, along with other materials, to the T&T Defendants.
[13] *See* Exhibit C, declaration of Cameron Kehm, Lightering's Director of International Operations, at ¶ 4. Mr. Kehm's declaration was previously submitted with Lightering's pending motion for summary judgment in the two consolidated wrongful death actions pending before the Honorable Judge Lynn N. Hughes as civil action H-18-161.

chartered offshore supply vessels docking/berthing at the T&T facility.[14]   Depending on

circumstances/operational needs, such vessels might be docked for extended periods of time while

on standby awaiting orders, or they might be docked only as long as was necessary to load/unload

equipment and/or to accomplish periodic crew changes.[15]   T&T would, upon request, provide its

equipment and/or personnel for purposes of loading and/or unloading Lightering's equipment

to/from such vessels.[16]   When not in use offshore, Lightering also stored and maintained its

lightering equipment at the T&T facility.[17]

On September 20, 2017, a T&T employee was operating a T&T crane in order to load

Lightering's equipment on the ELLIOTT CHERAMIE, one of Lightering's chartered vessels,[18]

which was docked at T&T's facility.   In the course of operating the crane, a 60-ton Tadano mobile

crane positioned on the T&T dock alongside the supply vessel, the T&T employee failed to ensure

the crane's outriggers were in place before he began swinging the crane's boom towards a piece

of equipment located on the dock behind the crane.   Shortly after the crane operator began

swinging the boom back toward the waiting equipment, the boom's weight pulled the crane over

onto its side, striking and killing two individuals, Tai Vong and Blake Carlisle, who had been

supplied to work for Lightering by temp agency Express Services, Inc.   Four others claimed to

have sustained physical and emotional "bystander" injuries: Mario Ruiz, Sr., and three

crewmembers aboard the ELLIOTT CHERAMIE.

Within two days of the accident, the first wrongful death lawsuit was filed.   Beginning on

or about October 6, 2017, which was less than twenty days after the accident occurred, counsel for

---

[14] *See* Exhibit C, Kehm declaration, at ¶ 4.
[15] *Id*.
[16] *Id*.
[17] *Id*.
[18] *Id*.

the T&T entities began proposing mediation to the various claimants/interested parties.[19] Eventually two mediation sessions were scheduled for October 30-31, 2017. On the afternoon of October 27, 2017, which was the Friday before the mediations were to begin, counsel for T&T sent a letter to counsel for Lightering demanding defense, indemnity, and additional insured coverage for T&T Offshore and Teichman Group from Lightering and its insurers pursuant to the terms of the Master Services Agreement at issue in this action.[20] Due to the extremely short notice, Lightering was not able to respond until the first day of mediation, which it did by putting T&T on notice of several issues, including that the contract at issue had expired prior to the time of the accident.[21]

It is believed that the T&T entities reached settlements with the majority of the wrongful death and personal injury claimants either at or fairly soon after the mediation sessions.[22] These settlements are believed to collectively total in the tens of millions of dollars, though Plaintiffs cannot confirm the dollar amounts due to T&T's refusal to provide any details of the settlements based on purported confidentiality concerns. At present, the T&T entities are known to be defendants in the actions filed by the purported father of one of the two decedents (Blake Carlisle), as well as an action by Lightering employee Mario Ruiz, Sr., for personal injury damages.[23]

---

[19] See Exhibit D, email correspondence from counsel for T&T dated October 6, 2017.

[20] See Exhibit E, correspondence from counsel for T&T dated October 27, 2017.

[21] See Exhibit F, correspondence from counsel for Lightering to counsel for T&T dated October 30, 2017.

[22] At page 1 of their Motion, the T&T Defendants assert: "Because of OSG's [sic] surprise disavowal of the MSA, T&T was forced to defend and settle the death and injury claims brought by OSG employees…." The utter falsity of this assertion is highlighted by, among other things, that fact that T&T first proposed mediation less than twenty days after the accident occurred; scheduled and conducted mediations sessions a mere forty days after the accident; gave Lightering and its insurers approximately 48 hours' notice in advance of the mediation of their demand for defense, indemnity and additional insured coverage; and, is believed to have entered into settlement agreements with nearly all of the wrongful death and personal injury claimants, with payouts collectively totaling tens of millions of dollars, either at or shortly after those mediation sessions. All of the foregoing occurred before, at least to Plaintiffs' knowledge, any T&T entity made an appearance as a defendant in any litigation related to the accident.

[23] For the Court's convenience, attached hereto as Exhibit G is a diagram that was previously filed in the two consolidated wrongful death actions pending before the Honorable Judge Lynn N. Hughes as civil action H-18-161 and which was intended to provide the status of known claims and litigation to date arising out of the September 20, 2017, accident.

## B.     The Contract at Issue

The Master Services Agreement (MSA) at issue in this matter was entered on January 1, 2011, between Lightering, then known as OSG Lightering LLC, and T&T Offshore.[24]  The MSA, which contained a general maritime law choice of law clause,[25] [26] stated in relevant part as follows regarding its purpose and scope:

> T&T is an independent contractor engaged in providing offshore launch services and related businesses.  [Lightering] requires certain services from T&T and may in the future require additional goods and/or services from T&T.  The parties intend that this contract shall govern the provision of goods and services by T&T to [Lightering].

> Goods and Services Provided by T&T.  [Lightering] intends to operate an offshore lightering service with equipment and workboats based in Galveston, Texas. [Lightering] anticipates that this service will employ two or more workboats and require storage for fenders, hoses and related equipment for such workboats and offshore lightering services.

> For the sum of $16,500 per month, T&T agrees to provide:

> a.   Wharfage and Storage areas: T&T will provide wharf space where up to a total of (3) of [Lightering's] offshore workboats of up to 200 feet in length may simultaneously be safely moored always afloat…. T&T will provide storage space at said location for [Lightering's] ancillary equipment including, fenders, cargo hoses, shipping containers and parking for [Lightering's] chartered workboat personnel, representatives and customers per Exhibit B.

> T&T will also provide approximately 5,000 square feet of warehouse for [Lightering's] use.  It is expressly understood that while wharfage and storage space sufficient for the above purposes will be provided, such space will also be used for

---

[24] *See* Exhibit A-1, MSA, at p. 1.

[25] *See* Exhibit A-1, MSA, at p. 16, clause 17.

[26] In their Motion, the T&T Defendants state: "Even if this Court determines that the MSA is a maritime contract, it does not follow that maritime law governs the question of whether the parties impliedly extended the MSA through their conduct.  Rather, the question of which law governs is a complicated one that will require extensive briefing." *See* Doc. 29 at footnote 2.  While not relevant to the present issue being decided by the Court, Plaintiffs submit that the issue is not overly complex, as the presence of the maritime choice of law clause in the expired MSA, when combined with the overwhelming amount of evidence establishing the maritime nature of the contract at issue, establishes that maritime law, not Texas law, governs. *See, e.g., Great Lakes Reinsurance (UK) PLC v. Durham Auctions, Inc.*, 585 F.3d 236, 242 (5th Cir. 2009).  Moreover, as will be shown in subsequent briefing Plaintiffs will be submitting to the Court, the applicable maritime law as well as Texas law supports the conclusion that the MSA expired by its own terms long before the accident at issue occurred and thus the defense, indemnity, and additional insured provisions in same are not enforceable. *See, e.g., Sphere Drake Ins. Co. v. La Gloria Oil & Gas Co.*, 121 F.3d 705 (5th Cir. 1997); *Channette v. Neches Gulf Marine, Inc.*, 440 Fed. Appx. 258, 261 (5th Cir. 2011); and, *Griffin Indus., Inc. v. Foodmaker, Inc.*, 22 S.W.3d 33, 36 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

the mooring of T&T vessels, vessels of its other clients and storage of equipment owned by T&T and others. The wharf, storage and warehouse space for [Lightering's] use will be hereinafter referred to as the "Facilities." The Facilities will be located on Pelican Island in the Port of Galveston, also known as 2915 Todd Road. T&T will ensure that [Lightering] and its duly authorized employees and contractors have access at all times to the Facilities….

b. Dockside Services. T&T will ensure that adequate labor is available at the Facilities to accomplish such tasks as [Lightering] may reasonably require, including loading and discharging equipment from [Lightering's] workboats, general repairs to [Lightering's] equipment and the like. [Lightering] and its sublessees shall utilize T&T's services while at the Facilities. T&T will ensure that a crane of at least 50 ton capacity and a forklift of at least 4000 pound capacity is available at the Facilities at all times. Should [Lightering] require labor at the Facilities, [Lightering] shall make its requirements known to T&T as soon as possible to assist T&T in properly scheduling personnel….Rates for dockside services are as follows….[27]

The MSA's duration was specified as follows: "This Agreement shall commence on the date written below and remain in effect for four (4) years from January 1, 2011."[28] The MSA did not include any provision for automatic renewal after it terminated. Furthermore, the MSA specifically stated: "[t]his Agreement constitutes the entire agreement between the parties concerning this subject matter, and may not be amended, modified, or waived except in writing signed by the parties."[29]

On May 1, 2013, the parties signed a one-page addendum to the MSA to reduce the monthly base rate for services from $16,500 to $15,500.[30] The addendum did not change any other terms of the MSA.[31] This was the only amendment or addendum ever made to the MSA.

From 2011 through 2014, Lightering used the T&T dock as a home base for its chartered workboats.[32] Having such a base was a critical component of Lightering's operations in the Gulf

---

[27] *See* Exhibit A-1 at clause 2.
[28] *See* Exhibit A-1 at clause 14.
[29] *See* Exhibit A-1 at 17.
[30] *See* Exhibit A-1 at page marked LLLC DEC000070.
[31] *Id*.
[32] *See* Exhibit A, Wrenn declaration, at ¶ 8.

of Mexico region, because the workboats must have a dock to return to when not offshore to use while on standby awaiting orders, for loading/unloading lightering equipment, for embarking/disembarking passengers such as Lightering's Mooring Masters, and/or for accomplishing periodic crew changes and occasional routine maintenance and repair operations.[33]

From 2011 to 2014, Lightering's chartered workboat fleet that used the T&T dock consisted of the following vessels:

| 2011 | 2012 | 2013 | 2014 |
|------|------|------|------|
| JOSEPHINE K MILLER<br>MAX CHERAMIE<br>ELLIOTT CHERAMIE | JOSEPHINE MILLER<br>RANA MILLER<br>MAX CHERAMIE | JOSEPHINE MILLER<br>RANA MILLER<br>MAX CHERAMIE<br>ELLIOTT CHERAMIE | JOSEPHINE MILLER<br>MAX CHERAMIE[34] |

Lightering also used the T&T facility for temporary storage of lightering equipment when not in use in lightering operations.[35] This equipment, when not being carried by the workboats or deployed in the water for lightering operations, could be temporarily stored at the T&T facility, either dockside, in the portion of warehouse space T&T allowed Lightering to use, or in an open storage area adjacent to the warehouse that T&T also allowed Lightering to use.[36] This equipment never left the T&T facility except when being used in lightering or other operations offshore.[37] Further, T&T always had the right to ask Lightering to move or shift its equipment in order to accommodate T&T's own operations at the facility, and it did so periodically, and Lightering always complied with such requests.[38]

By its express terms, the MSA expired on December 31, 2014.[39] By that time, the individuals who had signed the MSA and addendum on behalf of Lightering were no longer with

---

[33] *Id.*
[34] *Id.* at ¶ 9.
[35] *Id.* at ¶ 10.
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *See* Exhibit A-1, MSA, at clause 14.

the company.[40]  Instead, Clayton Wrenn, who had been with the company for a number of years, was serving as President and Managing Director, a role which she has occupied through the present, while Cameron Kehm had replaced Mr. Doolittle as Director of Offshore and Technical Services.[41]

On January 28, 2015, T&T employee Deborah Crump at T&T sent an email to Mr. Kehm stating as follows:

> Lease agreement between OSG & T&T Marine Salvage, Inc., has expired as of December 31, 2014.  We have the new contract ready for signature and need to know the correct person to email it to, can you help me with that?  It would greatly be appreciated.[42]

Mr. Kehm responded by advising to send the contract to Clayton Wrenn.[43]  On January 29, 2015, Ms. Crump emailed Ms. Wrenn and stated as follows:

> Please find attached 2015 Contract for lease agreement which is currently expired as of December 31, 2014.  Please review, sign and return asap. Should you have any questions, please don't hesitate to give us a call.[44]

Several hours after Ms. Crump sent her email, Ms. Wrenn responded as follows:

> Thank you Deborah - we will review soonest. I will need to set up a time to meet with Kevin to discuss in further detail. I believe our current contract has a provision that facilitates month-to-month lease (evergreen) upon expiration but will have to review to be sure - but rest assured we have not yet considered the option of relocation. We have simply been too busy to address - but intend to ASAP. We will endeavor to work through the details quickly.[45]

There is no dispute that the MSA at issue does not actually contain any type of automatic renewal provision.  No one at Lightering ever signed the new MSA or otherwise agreed to a month-

---

[40] *See* Exhibit A, Wrenn declaration, at ¶ 12.
[41] *Id.*
[42] *See* Exhibit A-3, January 28-29, 2015, email correspondence.
[43] *Id.*
[44] *Id.*
[45] *Id.*

to-month, or any other, continuance of the MSA.[46]  Further, T&T never responded to Ms. Wrenn's January 29, 2015, email.[47]

Despite its knowledge that the MSA had expired as of December 31, 2014, and that Lightering had not signed a new contract after that date, as well as the undisputed lack of any "evergreen" or automatic renewal provision actually being in the expired MSA, T&T allowed Lightering to continue its operations at the T&T facility until the time of the accident at issue. Moreover, beginning in February 2015, which was the month after the email exchange referenced above took place, T&T unilaterally increased the monthly base rate charged to Lightering by $1,000, from $15,550 to $16,500.[48]  T&T did so without obtaining a written, fully executed amendment or other agreement changing the monthly rate, as would have been required by the express terms of the expired MSA and as T&T had done in May 2013 when the rate was lowered from $16,500 to $15,500.[49]  This increased rate was charged (and paid) without interruption until the time of the accident.[50]

## IV.    **ARGUMENT/AUTHORITIES**

### A.    **Standard of Review**

A claim may not be dismissed for lack of subject-matter jurisdiction under Rule 12(b)(1) unless it appears certain that the plaintiff can prove no set of facts in support of his claim that would entitle it to relief. *See Bombardier Aerospace Employee Welfare Benefits Plan v. Ferrer, Poirot & Wansbrough*, 354 F.3d 348, 351 (5th Cir. 2003).  When examining a factual challenge to subject-matter jurisdiction under Rule 12(b)(1), which does not implicate the merits of a plaintiff's cause of action, the district court has substantial authority "to weigh the evidence and satisfy itself

---

[46] *See* Exhibit A, Wrenn declaration, at ¶ 17.
[47] *Id*. at ¶ 14.
[48] *Id*. at ¶ 22.
[49] *Id*. at ¶ 23.
[50] *Id*. at ¶ 22.

as to the existence of its power to hear the case." *Young v. Vannerson*, 612 F. Supp. 2d 829, 836 (S.D. Tex. 2009), citing *Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir. 1997).

**B.     Plaintiffs' Complaint Sufficiently Plead Subject-Matter Jurisdiction**

The T&T Defendants assert that Plaintiffs did not sufficiently plead the basis of this Court's subject-matter jurisdiction.[51] This is borderline frivolous. Plaintiffs' Complaint contains the following statement:

> This Court possesses subject matter jurisdiction pursuant to 28 U.S.C. § 1333. This is a case of admiralty and maritime jurisdiction, and is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure because the claims at issue involve alleged defense, indemnity and insurance obligations in a maritime contract. *See, e.g., Garanti Finansal Kiralama S.A. v. Aqua Marine & Trading, Inc.*, 697 F.3d 59 (2d Cir. 2012) (Court noted that even though Plaintiff in declaratory judgment action disclaimed existence of maritime contract, "there is no question but that we would have jurisdiction over [declaratory judgment defendants'] hypothetical coercive suit to enforce the contract… Thus we have jurisdiction over this declaratory judgment action as well.").[52]

The foregoing is more than sufficient for pleading purposes. See FRCP 8 (Complaint must contain "a short and plain statement of the grounds for the court's jurisdiction"); FRCP 9(h); and, *T.N.T. Marine Serv., Inc. v. Weaver Shipyards & Dry Docks, Inc.*, 702 F.2d 585, 587–88 (5th Cir. 1983). Moreover, the contract at issue was attached as an exhibit to Plaintiffs' Complaint,[53] and, as discussed below in further detail, the terms of the contract alone establish that it is a maritime contract as a matter of law. Plaintiffs sufficiently plead the basis of this Court's subject-matter jurisdiction.

---

[51] Doc. 29 at p. 4.
[52] *See* Plaintiffs' Second Amended Complaint at pp. 2-3, ¶ 6  [Doc. 16].
[53] *See* Doc 16-2.

## C.    The MSA is a Maritime Contract

### 1.    "Services From a Vessel" is not a Necessary Element of a Maritime Contract

The T&T Defendants assert that a contract is only maritime if "it calls for substantial work to be performed from a vessel"; that this requirement was established by the Fifth Circuit's recent decision in *In re Larry Doiron, Inc.*; and, that because the MSA did not call for T&T to perform work from a vessel, the MSA is not a maritime contract.  T&T is incorrect on all counts.

*Doiron* expressly stated that it was only dealing "with determining the maritime or nonmaritime nature of contracts involving the exploration, drilling, and production of oil and gas," though it also stated that "[i]f an activity in a non-oil and gas sector involves maritime commerce and work from a vessel, we would expect that this test would be helpful in determining whether a contract is maritime." 879 F.3d at 23, n. 52.  There is no dispute that the contract at issue did not involve the exploration, drilling, and production of oil and gas.  Further, while the contract did not explicitly call for work from a vessel,[54] it did involve maritime commerce, and vessel operations, i.e., docking at the T&T facility, and operations involving vessels, i.e., loading and unloading cargo/equipment from vessels docked at the T&T facility, are involved.

Instead, and as recognized by *Doiron*,[55] the US Supreme Court's 2004 decision in *Norfolk v. Kirby* sets forth the actual test for determining whether a contract is maritime.  *Kirby* involved a contract of carriage that included both ocean transportation and then through carriage by rail car. The cargo was damaged on the land leg of the transit, and the question was whether maritime law applied to the entire contract of carriage. *Id.* at 21-23.

---

[54] Plaintiffs note that even though it is not required for determining that the MSA at issue is a maritime contract, the MSA did impliedly call for T&T to perform some work from a vessel.  Specifically, T&T often used its derrick crane barges when performing vessel loading and unloading services for Lightering, as shown in Exhibit H, which is T&T's invoice for November 2014, and which references services from the CURTIS T.  Details of the CURTIS T can be found at http://teichmangroup.com/equipment.html, accessed June 7, 2018. A derrick crane barge is a vessel. *See In re Endeavor Marine Inc.*, 234 F.3d 287, 291 (5th Cir. 2000).
[55] *See Doiron*, 879 F.3d at 574.

In resolving this issue, the Supreme Court first stated that "[t]o ascertain whether a contract is a maritime one, we cannot look to whether a ship or other vessel was involved in the dispute," since the boundaries of maritime contract jurisdiction are "conceptual rather than spatial." *Id*. at 23. "Instead, the answer 'depends upon . . . the nature and character of the contract,' and the true criterion is whether it has 'reference to maritime service or maritime transactions.'" *Id*. at 24. Second, "the fundamental interest giving rise to maritime jurisdiction is 'the protection of maritime *commerce*,'" and "[t]he conceptual approach vindicates that interest by focusing on whether the *principal objective* of a contract is maritime commerce" and "[t]he conceptual approach vindicates that interest by focusing on whether the *principal objective* of a contract is maritime commerce." *Id*. at 25.

Well-settled pre-*Kirby* jurisprudence and the case law interpreting *Kirby* demonstrate that maritime contract jurisdiction is far broader than contracts that "call for substantial work to be performed from a vessel." In *Thurmond v. Delta Well Surveyors*, 836 F.2d 952 (5th Cir. 1988), the court stated that "A contract relating to a ship in its use as such, or to commerce or navigation on navigable waters, or to transportation by sea or to maritime employment is subject to maritime law and the case is one of admiralty jurisdiction, whether the contract is to be performed on land or water." 988 F.2d at 954 (quoting 1 E. Jhirad, A. Sann, B. Chase & M. Chynsky, Benedict on Admiralty § 183, at 11-6 (7th ed. 1985). Nothing in this classic statement of admiralty contract jurisdiction requires services "from a vessel."

There are numerous examples pre- and post-*Kirby* of contracts that do not involve "services from a vessel" that have been held to be maritime in nature. A contract to insure a vessel, cargo or other maritime property involves no "work performed from a vessel," but marine insurance contracts have always been considered maritime in nature. *New England Mutual v. Dunham*, 78

U.S. 1 (1870). In the aftermath of *Kirby*, the courts have continued to consider insurance contracts to be maritime in nature even if the policy also insured non-maritime risks, so long as the principal objective of the contract was maritime in nature. *See, e.g., Folksamerica Reinsurance Co. v. Clean Water of New York*, 413 F.3d 307 (2d Cir. 2005).

Further, contracts to provide services to vessels as opposed to contracts to provide services from vessels have invariably been held to be within the admiralty jurisdiction. *See, e.g., Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603 (1991) (general agency contract to provide necessaries to vessels); *North Pacific S.S. Co. v. Hall Bros. Shipbuilding*, 249 U.S. 119 (1919) (contract to repair a vessel that involved hauling the vessel out of the water); *Mahony v. Lowcountry Boatworks, LLC*, 465 F. Supp. 2d 547 (D.S.C. 2006) (contract to launch vessel). Finally, even contracts which did not refer to any specific vessel or shipment have been held to be maritime contracts. *Flame S.A. v. Freight Bulk Pte. Ltd.*, 762 F.3d 352, 362 (4th Cir. 2014) ("Similarly, freight forwarding agreements have been held to be maritime. First, with respect to Freight Bulk's argument that the FFAs have no connection to any particular vessel or shipment, the Supreme Court [in *Kirby*] has directly held that a maritime contract need not refer to any particular vessel. Nor do maritime contracts need to refer to any particular shipment. In fact, several district courts have concluded that FFAs are maritime contracts regardless of the fact that they do not refer to any particular vessels or shipments because 'the purpose of the [FFA] is to facilitate maritime commerce.' Thus, the fact that the FFAs in this case did not refer to a particular vessel or a particular voyage is not dispositive.") (internal citations omitted).[56]

Under the MSA, T&T provided wharfage, stevedoring and other services to Lightering's chartered vessels to enable those vessels to engage in commerce and navigation on navigable

---

[56] *Also see d'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd.*, 886 F.3d 216, 228 (2d Cir. 2018) ("In any event, there is no requirement that a maritime contract concern a particular vessel, seaman, or shipment.").

waters. The fact that the MSA did not expressly call for services from a vessel[57] is irrelevant to the question at hand.

### 2. The MSA is a Maritime Contract Because its Objective is Maritime Commerce and it has Reference to Maritime Services

Under *Kirby* and other well-established maritime jurisprudence, the MSA is a maritime contract because its objective is maritime commerce, and it has reference to maritime service or maritime transactions. First, its expressly stated purpose is to facilitate Lightering's conduct of offshore lightering operations.[58] Lightering is a traditional maritime activity. *See, e.g., Saudi v. S/T Marine Atl.*, 159 F. Supp. 2d 492, 497 (S.D. Tex. 2000)("Saudi was injured in navigable waters aboard a tanker vessel while performing a traditional maritime activity of mooring the vessel for lightering and his injury allegedly was caused by corrosion of the vessel's portside crane.").

Second, the services T&T agreed to provide to Lightering have long been considered to be maritime. As discussed above, the MSA called for T&T Offshore to provide services that primarily consisted of the following:

    a. wharfage/dockage for the chartered support vessels Lightering used in its offshore lightering operations[59];

    b. dockside storage (warehouse and open areas) for Lightering's equipment (fenders, hoses, and similar equipment necessary for lightering operations) during the temporary periods of time such equipment was not being utilized in offshore lightering operations[60]; and,

    c. dockside services for loading and discharging the foregoing equipment to and from Lightering's vessels, as well as general repairs to such equipment and vessels as needed.[61]

---

[57] *See* footnote 54 herein.
[58] *See* Exhibit A-1 at clause 2.
[59] *Id.* at clause 2.a.
[60] *Id.*
[61] *Id.* at clause 2.b. The T&T Defendants do not dispute that vessel loading and unloading services are maritime. *See* T&T Defendants' Motion at p. 10, footnote 17, citing *A/S J. Ludwig Mowinckels Rederi v. Commercial Stevedoring Co.*, 256 F.2d 227 (2d Cir. 1958).

Regarding the first category of services, in *Ex parte Easton*, 95 U.S. 68 (1877), the U.S. Supreme Court expressly recognized and explained why contracts for wharfage constitute maritime contracts when it stated the following:

> Maritime jurisdiction of the admiralty courts in cases of contracts depends chiefly upon the nature of the service or engagement, and is limited to such subjects as are purely maritime,[62] and have respect to commerce and navigation within the meaning of the Constitution. Wide differences of opinion have existed as to the extent of the admiralty jurisdiction; but it may now be said, without fear of contradiction, **that it extends to all contracts, claims, and services essentially maritime, among which are** bottomry bonds, contracts of affreightment and contracts for the conveyance of passengers, pilotage on the high seas, **wharfage**, agreements of consortship, surveys of vessels damaged by the perils of the seas, the claims of material-men and others for the repair and outfit of ships belonging to foreign nations or to other States, and the wages of mariners; and also to civil marine torts and injuries, among which are assaults or other personal injuries, collision, spoliation, and damage, illegal seizures or other depredations on property, illegal dispossession or withholding of possession from the owners of ships, controversies between the part owners as to the employment of ships, municipal seizures of ships, and cases of salvage and marine insurance. **Wharf accommodation is a necessity of navigation, and such accommodations are indispensable for ships and vessels and water-craft of every name and description, whether employed in carrying freight or passengers, or engaged in the fisheries. Erections of the kind are constructed to enable ships, vessels, and all sorts of water-craft to lie in port in safety, and to facilitate their operation in loading and unloading cargo and in receiving and landing passengers.**

*Id.* at 72–73 (emphasis added) (internal citations omitted).

More recently, in *Sisson v. Ruby*, 497 U.S. 358 (1990), the Supreme Court echoed the foregoing in considering whether there was subject-matter jurisdiction in a limitation of liability action:

> The fundamental interest giving rise to maritime jurisdiction is "the protection of maritime commerce," and we have said that that interest cannot be fully vindicated unless *"all* operators of vessels on navigable waters are subject to uniform rules of conduct…." The need for uniform rules of maritime conduct and liability is not

---

[62] The notion that a contract must be "purely maritime" to invoke admiralty jurisdiction is no longer tenable after *Kirby. See Folksamerica Reinsurance Co. v. Clean Water of New York*, 413 F.3d 307 (2d Cir. 2005); *Sentry Select Ins. V. Royal Inc. Co. of America*, 481 F.3d 1208 (9th Cir. 2007); *St. Paul Fire & Marine Insurance Co. v. Board of Commissioners*, 418 F.App'x 305, 309 (5th Cir. 2011).

limited to navigation, but extends at least to any other activities traditionally undertaken by vessels, commercial or noncommercial.

> **Clearly, the storage and maintenance of a vessel at a marina on navigable waters is substantially related to "traditional maritime activity" given the broad perspective demanded by the second aspect of the test. Docking a vessel at a marina on a navigable waterway is a common, if not indispensable, maritime activity. At such a marina, vessels are stored for an extended period, docked to obtain fuel or supplies, and moved into and out of navigation. Indeed, most maritime voyages begin and end with the docking of the craft at a marina. We therefore conclude that, just as navigation, storing and maintaining a vessel at a marina on a navigable waterway is substantially related to traditional maritime activity.**

*Id*. at 367 (internal citations omitted) (emphasis added). And in determining that a contract for wharfage involving dry storage of boats (in contrast to the MSA, which contemplates the workboats would not leave the water) was within admiralty jurisdiction, the Fifth Circuit stated as follows:

> Several courts have imposed maritime liens for docking, wharfage, or storage fees, particularly when some repairs were being performed upon the boats as well. By contrast, in those older cases which did not impose such liens, the vessels were much more completely removed from navigation than the ones at issue here. We conclude, therefore, that the boats were not withdrawn from navigation and that the contracts for their dry storage were within admiralty jurisdiction.

*Am. E. Dev. Corp. v. Everglades Marina, Inc.*, 608 F.2d 123, 124–25 (5th Cir. 1979) (internal citations omitted). *See also Selame Assoc., Inc. v. Holiday Inns, Inc.*, 451 F.Supp. 412, 418 (D.Mass. 1978) ("A contract to provide wharfage or storage is a maritime contract and a breach of this contract is cognizable in admiralty.") (citations omitted).

Regarding the second category of services called for by the MSA, there should be no dispute that the equipment Lightering stored at the T&T facility during the temporary periods it was not in use offshore in lightering operations was vessel equipment, even if the equipment was used by different vessels at different times due to the nature of lightering operations. Contracts for temporary storage of vessels on land are maritime contracts. *See Everglades Marina*, 608 F.2d

123, 124–25; and, *Fireman's Fund Am. Ins. Co. v. Boston Harbor Marina, Inc.*, 406 F.2d 917, 919

(1st Cir. 1969). Similarly, to the extent this equipment is not assigned to a particular vessel and is

thus more akin to cargo carried by vessels, courts have held that bailment (i.e., storage) of cargo

on land prior to and after shipment at sea is a maritime contract. *Baker Oil Tools, Inc. v. Delta S.*

*S. Lines, Inc.*, 562 F.2d 938, 940 (5th Cir. 1977). Therefore, by analogy, a contract that calls for

temporary storage on land of equipment such as that at issue herein concomitant with a contract of

wharfage is a maritime contract.

Finally, regarding the third category of services in the MSA, vessel loading and unloading

services are maritime,[63] and contracts relating to service or repair of a vessel are maritime

contracts. *See New Bedford Dry Dock Co. v. Purdy*, 258 U.S. 96, 99 (1922); *Diesel Repower, Inc.*

*v. Islander Invs., Ltd.*, 2002 AMC 751, 271 F.3d 1318, 1322-23 (11 Cir. 2001). The same is true

for contracts for services to vessel equipment on land. *See, e.g., AXA Re Prop. & Cas. Ins. Co. v.*

*Tailwalker Marine, Inc.*, C.A. 2:04-1684-23, 2004 WL 3680276 (D.S.C. Dec. 17, 2004).

**D.     The MSA is not a "Lease of Real Property"**

**1.     In Form and Substance, the MSA is a Contract for Services, Not a Lease**

Despite all of the foregoing, the T&T Defendants contend that the MSA is not a contract

for maritime services but is instead a non-maritime "lease or real property." This argument is

without merit, because in addition to the evidence and authorities detailed above: a) T&T and

Lightering expressly characterized the MSA as a contract for services, and there no language in

the MSA describing the contract as a "lease"; and, b) the substance of the MSA establishes that it

is a contract for services rather than a "lease."

As a preliminary matter, there should be no dispute that the MSA does not contain express

---

[63] Defendants do not dispute this point.

reference to being a "lease" of anything. Nor does it contain any references to "rent" being owed to T&T (and T&T's invoices, examples of which are conspicuously absent from Defendants' Motion, similarly do not make any reference to charges being "rent").[64] Also, while the T&T Defendants argue that statements made by entities other than Lightering establish that the MSA was a lease,[65] even if such statements could be attributed to Lightering, which is denied, unambiguous contracts cannot be altered or modified by extrinsic evidence, and thus such statements have no bearing on the issues before this Court.[66] *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 332–33 (5th Cir. 1981) ("Although Shell insists that under Louisiana law the intent of contracting parties may always be shown by extrinsic evidence, federal maritime law is different: a court may not look beyond the written language of the document to determine the intent of the parties unless the disputed contract provision is ambiguous. The district court, therefore, properly refused to consider parol evidence of the parties' intentions and focused solely on the unambiguous language of the Purchase Order.") (internal citations omitted); *Tremont LLC v. Halliburton Energy Services, Inc.*, 696 F. Supp. 2d 741, 846 (S.D. Tex. 2010) (applying Texas law) ("Because the contract language is not ambiguous, it is not appropriate to consider extrinsic evidence about the parties' intent.").

Further, the substance as well as the form of the MSA establishes it is not a lease. A lease is "a conveyance of real property, usu. in return for rent, made for life, for fixed period, or at will— but always for less time than the lessor has a right to." Bryan A. Garner, A Dictionary of Modern

---

[64] *See* Exhibit H, T&T invoice for November 2014, which Plaintiffs submit is representative of all of the T&T invoices produced in discovery to date. However, Plaintiffs also note that because the MSA expired as of December 31, 2014, the only relevant years to consider for purposes of subject-matter determination are 2011-2014.

[65] *See* Doc. 29 at pp. 12-13, citing to Doc. 29-2.

[66] The case the T&T Defendants cite at p. 12 of their Motion, *Icon Amazing, L.L.C. v. Amazing Shipping, Ltd.*, 951 F. Supp. 2d 909 (S.D. Tex. 2013), is distinguishable in this regard because the statements made by one of the parties to the contract at issue which the court relied on in making its decision confirmed the substance of the contract at issue, unlike this case, where the T&T Defendants are attempting to use parol evidence to establish the contract at issue is something other than what its form and substance establishes.

Legal Usage 514 (2d ed. 1995). "Conveyance" in turn "refers . . . to the actual transfer of an interest in land." *Id.* at 221. For a variety of reasons, the MSA fails to meet this definition.

For a start, the MSA was between Lightering and T&T Offshore.[67] However, T&T Offshore is not the owner or lessee of the facility; the property is owned by Board of Trustees of the Galveston Wharves, and leased to T&T Marine Salvage, Incorporated, a separate corporate entity from T&T Offshore.[68] It is fundamental that one must have an interest in land to convey that interest, and unless there is a sublease from T&T Marine Salvage to T&T Offshore that has not been disclosed, T&T Offshore would not have had the right to convey an interest to Lightering, and thus could not have entered into a lease of the facility.

But even setting aside the foregoing, the MSA does not purport to convey the sort of interest in the property necessary for the MSA to be characterized as a lease. In *Toops v. Gulf Coast Marine, Inc.*, 72 F.3d 483, 487-88 (5th Cir. 1996), the Fifth Circuit addressed whether a vehicle had been "hired" within the meaning of an automobile insurance policy. In *Toops*, Dayton-Scott hired Rig Runner to deliver equipment. Rig Runner hired two drivers to transport the equipment on tractor-trailers from Louisiana to Texas. One of the tractor-trailers was involved in an accident, and Rig Runner demanded that Dayton-Scott's insurers defend it and pay any judgment against it up to policy limits, arguing that the tractor-trailer had been "hired" by Dayton-Scott and was thus a "covered auto." The Fifth Circuit rejected this argument, distinguishing between hiring a company that provides transportation and hiring a truck. The court stated, "For a vehicle to constitute a hired automobile, there must be a separate contract by which the vehicle is hired or leased to the named insured for his *exclusive* use or control." *Toops*, 72 F.3d at 487. *See also Loper v. Dufrene*, 84 Fed. Appx. 454, 456 (5th Cir. 2004).

---

[67] *See* Exhibit A-1, MSA, at p. 1.
[68] *See* Exhibit B.

Similarly, with respect to real estate, Texas law holds that "[A] lease grants a tenant exclusive possession of the premises as against the owner." *H.E.Y. Tr. v. Popcorn Express Co., Inc.*, 35 S.W.3d 55, 58 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). *See also Ellison v. Charbonneau*, 101 S.W.2d 310, 314) (Tex. Civ. App.—Fort Worth 1936)("It is always to be implied, in the absence of a stipulation to the contrary, that the tenant shall have the entire occupancy and use of the whole of the rented premises . . ..").

Under the MSA, T&T Offshore agreed to provide wharf space, which the contract at issue expressly characterized as "wharfage,"[69] not as a lease of dock space. Further, Lightering did not have the exclusive use and control of the premises in question necessary for the Master Services Agreement to be characterized as a lease. The MSA provided that T&T could require Lightering's vessels to "moor abreast of one another or other workboats utilizing the Facilities."[70] Had this been a lease of dock space, Lightering would have had the right to control how its vessels would be docked. Similarly, T&T agreed to provide warehouse space for Lightering to store the equipment used in its offshore lightering operations, but the MSA provided that "it is expressly understood that while wharfage and storage space sufficient for the above purposes will be provided, such space will also be used for the mooring of T&T vessels, vessels of its other clients and storage of equipment of T&T and others."[71] T&T periodically exercised the foregoing rights, and Lightering always complied.[72]

Simply put, the MSA is not a lease, and the T&T Defendants' attempt to establish otherwise fail as matter of law. The fact that Lightering did not lease the facility from T&T demolishes T&T's argument based on the geography of the facility. Lightering did not have the exclusive use

---

[69] *See* Exhibit A-1, MSA, at clause 2.a.
[70] *Id*.
[71] *Id*.
[72] *See* Exhibit A, Wrenn declaration, at ¶ 10.

of any part of the facility other than Lightering's office space (that Lightering built out at its own expense, and this was thus not included in the monthly payments), and T&T and its other customers were free to use all of the rest of the facility. The fact that T&T may have had a large facility that it used to provide Lightering with the maritime services in question is irrelevant to whether those services were maritime.

Similarly, T&T's argument that the majority of the money paid by Lightering was for non-maritime services is based on the false premise that Lightering was renting the dock rather than paying for wharfage, and that it was renting storage space rather than paying for the temporary storage of the equipment essential to the lightering operation. Moreover, while the T&T Defendants have attempted to breakdown the monthly charges by various categories of services,[73] the MSA itself does not indicate how much of the monthly payments were attributed to any single service that T&T provided. And, significantly, T&T's own invoices only specify three categories of charges:

- A monthly charge of $15,500 for "Dock Space and Dispatching Services for the Month of [month and year]";

- Charges for "Crane Use for the Month of [month and year]" which generally ranged between $5,000 to $15,000; and,

- Utilities (water and electricity), apparently prorated out of monthly bills directed to a T&T entity and typically totaling less than $1,500 each month.[74]

First, even if, purely for the sake of argument, it is assumed that some of the services included within the "Dock Space" charge are non-maritime, such as use of parking spaces, it is

---

[73] For those arguments, as well as others, the T&T Defendants rely on a declaration from Kevin Teichman. Contemporaneously with this Response, Plaintiffs are separately filing objections to the Teichman declaration. For the reasons set forth in that separate filing as well as herein, Plaintiffs submit that the declaration does not provide any basis for a finding that the MSA at issue is anything other than a maritime contract.
[74] *See* Exhibit H.

impossible to know how much of the monthly charge could be attributed to same (though it would likely be marginal, given the main purpose of the MSA). Second, since there is no dispute that vessel loading/unloading services are maritime, the only thing left are the monthly utility charges. Even if it is assumed that these are non-maritime, they are such a minor part of both the overall services called for by the MSA and T&T's monthly charges to Lightering for same that under *Kirby*, they would not establish that the MSA is a non-maritime contract.[75]

## 2. Defendants' Cited Authorities are Distinguishable from the Facts of this Case

As implicitly recognized by the T&T Defendants in their Motion, there does not appear to be any Fifth Circuit or Supreme Court case law holding that in order to be a maritime contract, a contract for dockage/wharfage must contain a reference to a specific vessel. Moreover, any such argument would be untenable in the aftermath of *Kirby*. As the Fourth Circuit held in *Flame S.A. v. Freight Bulk Pte. Ltd.*, *supra,* "with respect to Freight Bulk's argument that the FFAs have no connection to any particular vessel or shipment, the Supreme Court [in *Kirby*] has directly held that a maritime contract need not refer to any particular vessel."

Further, the non-binding authorities the T&T Defendants rely upon for that proposition and/or the seemingly related assertion that the MSA is actually a non-maritime lease of real property contract are, in addition to being non-binding on this Court, readily distinguishable from this case because of the differences in the types of contracts at issue in those cases and the MSA at issue herein. For example, a review of the lease agreement at issue in *Jaspriza v. Schlumberger Tech. Corp.*, CIV. 10-1859, 2010 WL 4879442 (E.D. La. Nov. 23, 2010) establishes that it was

---

[75] As recognized in *Doiron*, 879 F.3d at 575, *Kirby* rejected the "mixed-contract" analysis that several Circuits, including the Fifth, had used when it stated as follows: "Furthermore, to the extent that these lower court decisions fashion a rule for identifying maritime contracts that depends solely on geography, they are inconsistent with the conceptual approach our precedent requires. Conceptually, so long as a bill of lading requires substantial carriage of goods by sea, its purpose is to effectuate maritime commerce—and thus it is a maritime contract. Its character as a maritime contract is not defeated simply because it also provides for some land carriage." *Kirby*, 543 U.S. at 27.

completely different in form and substance from the MSA at issue in this case, such as having language expressly identifying the agreement as a "lease" and the parties as "lessor" and lessee."[76] Further, the court in *Jaspariza* stated that it was "not satisfied that the Agreement bears a direct link to a fleet of vessels because Landowners did not agree to render services upon any of Schlumberger's vessels." *Id*. at *3. A review of the other cases upon which T&T relies similarly reveals that they dealt with contracts that were by their terms and in substance leases of real property. In contrast, the MSA between T&T Offshore and Lightering bore a direct link to a fleet of vessels, i.e., Lightering's chartered workboats in the years 2011-2014, and T&T Offshore agreed to render services to that fleet of vessels (and as Defendants admit, did actually render such services).[77]

## V.    CONCLUSION

Plaintiffs have met their burden to establish this Court's subject-matter jurisdiction pursuant to 28 U.S.C. § 1333. Defendants have failed to provide any valid basis for finding that the contract at issue is not a maritime contract. Defendants' motion should be denied in its entirety.

---

[76] The leases at issue in *Jaspariza* and *Constantin Land Trust v. Epic Diving and Marine Services, LLC*, 2013 WL 1292275 (E.D. La. 2013), are attached hereto as Exhibit I. A review of both leases show they are completely different in form and substance from the MSA at issue in this case and more closely resemble the lease agreement between the Board of Trustees of the Galveston Wharves and T&T Marine Salvage, Incorporated, a copy of which is attached hereto as Exhibit B.

[77] The T&T Defendants also rely heavily on the following statement in *Jaspariza*: "A direct link to the operation of a ship in the context of a dock lease requires that the contract specify a particular vessel. Absent a provision in the contract specifying a particular vessel, the contract bears no direct link to a vessel." 2010 WL 4879442, at *3 (E.D. La. Nov. 23, 2010). As discussed above, this argument is untenable in light of *Kirby*.

Respectfully submitted,

**BLANK ROME LLP**

*/s/ Michael K. Bell*
**MICHAEL K. BELL**
**Attorney in Charge**
State Bar No.:  02081200
Federal Bar No. 5085
717 Texas Avenue, Suite 1400
Houston, Texas 77002
Telephone:  (713) 228-6601
Facsimile:  (713) 228-6605
Email: mbell@blankrome.com

**ATTORNEY FOR PLAINTIFF,
LIGHTERING LLC**

**and**

**CHAFFE MCCALL, L.L.P.**

*/s/ Harold K. Watson*
**HAROLD K. WATSON**
**Attorney in Charge**
Texas State Bar No.:  20938500
Federal Bar No.:  4345
801 Travis Street, Suite 1910
Houston, TX  77002
Telephone:  (713) 546-9800
Facsimile:  (713) 546-9806
Email:  watson@chaffe.com

**ATTORNEY FOR PLAINTIFFS,
STARR INDEMNITY & LIABILITY
COMPANY, AGSC MARINE
INSURANCE COMPANY MARKETED
AS ALLIANZ GLOBAL CORPORATE
& SPECIALTY, AND XL SPECIALTY
INSURANCE COMPANY**

**OF COUNSEL:**

**BLANK ROME LLP**

**DAVID G. MEYER**
State Bar No.: 24052106
Federal Bar No.: 732583
717 Texas Avenue, Suite 1400
Houston, Texas 77002
Telephone: (713) 228-6601
Facsimile: (713) 228-6605
Email: dmeyer@blankrome.com

**And**

**CHAFFE MCCALL, L.L.P.**

**LISA M. KAUFMANN**
Texas State Bar No.: 24072841
Federal Bar No.: 1708528
801 Travis Street, Suite 1910
Telephone: (713) 546-9800
Facsimile: (713) 546-9806
Email: kaufmann@chaffe.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served pursuant to Rule 5 of the Federal Rules of Civil Procedure on all counsel of record on this the 8th day of June, 2018.

| | |
|---|---|
| **Counsel for Teichman Group, LLC and T&T Offshore, Inc.** | Susan Noe Wilson<br>Michael Hogue<br>M. Lane Lowrey<br>Schouest Bamdas Soshea & BenMaier PLLC<br>1001 McKinney Street, Suite 1400<br>Houston, Texas 77002<br><br>Claude L. Stuart III<br>Evan T. Caffrey<br>Hall Maines Lugrin, PC<br>Williams Tower<br>2800 Post Oak Boulevard, 64th Floor<br>Houston, Texas 77056<br><br>Lynne Liberato<br>Mark Trachtenberg<br>Haynes & Boone, LLP<br>1221 McKinney, Suite 2100<br>Houston, Texas 77010-2007 |
| **Counsel for Starr Indemnity & Liability Company and AGCS Marine Insurance Company** | Harold K. Watson<br>Lisa M. Kaufmann<br>Chaffe McCall, LLP<br>801 Travis Street, Suite 1910<br>Houston, Texas 77002 |

*/s/ David G. Meyer*
David G. Meyer