**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| LIGHTERING LLC, STARR | § | |
| INDEMNITY & LIABILITY COMPANY, | § | |
| and AGCS MARINE INSURANCE | § | |
| COMPANY, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-17-3374 |
| | § | |
| TEICHMAN GROUP, LLC, and | § | |
| T&T OFFSHORE, INC., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM & OPINION GRANTING THE DEFENDANTS' RULE 12(B)(1)
MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

This is a contractual-indemnity dispute arising out of underlying wrongful-death and personal-injury lawsuits filed after a crane accident in September 2017. The underlying plaintiffs sued the Teichman Group, LLC, T&T Offshore, Inc.,[1] and OSG Lightering, LLC,[2] seeking damages for the deaths and injuries. OSG Lightering, Starr Indemnity & Liability Company, and AGCS Marine Insurance Company sued Teichman and T&T seeking a declaratory judgment that there is no contractual obligation to defend, indemnify, or provide additional insurance coverage to Teichman or T&T for the underlying wrongful-death and personal-injury lawsuit. OSG Lightering, Starr, and AGCS invoke the court's admiralty and maritime jurisdiction under 28 U.S.C. § 1333. T&T moved to dismiss under Rule 12(b)(1), arguing that admiralty jurisdiction is improper and the

---

[1] T&T and Teichman are related entities, referred to collectively as "T&T."

[2] OSG Lightering LLC changed its name to Lightering LLC in 2017. At the time of the underlying incident and in the terms of the disputed contract, it is referred to as OSG Lightering, which is how it is referred to in this opinion.

court lacks subject matter jurisdiction.

Based on a careful review of the motion, the response, and the reply; the record; and the applicable law, the motion to dismiss for lack of subject matter jurisdiction, (Docket Entry No. 29), is granted. The reasons for this ruling are analyzed below.

## I. Background

### A. Factual Background

OSG Lightering provides, among other things, lightering services. Lightering involves transferring cargo from one vessel to another. OSG Lightering transfers liquid cargo, such as petrochemical products, and handles all parts of the lightering process, "including providing Mooring Masters and Assistant Mooring Masters, who, similar to compulsory harbor pilots, board the two lightering vessels and provide the Master and crew of each vessel with expert advice, instructions, and recommendations on executing the lightering operation from start to finish." (Docket Entry No. 31 at 8). OSG Lightering provides its own equipment for the lightering process, but charters workboats, operated by seamen specially trained in lightering, that transport both equipment and crew to and from a lightering operation. ACGS Marine Insurance provided excess insurance coverage to OSG Lightering. TT Club, which is not a party, provided primary insurance coverage.

In September 2017, OSG Lightering was using T&T's Pelican Island facility, an on-land building in Galveston, Texas, as part of its lightering operations. OSG Lightering would dock its chartered workboats and store its lightering equipment at the facility. The workboats were docked at T&T's facility for long periods between cargo loads, and for shorter periods for loading, unloading, or changing crew. T&T would also provide equipment or personnel to assist in loading

or unloading OSG Lightering's equipment from the workboats.

On September 20, a T&T employee was operating a T&T-owned crane to load OSG Lightering's equipment onto a chartered workboat docked at the T&T Pelican Island facility. According to the complaint, the T&T employee failed to properly place the crane's outriggers before he swung the boom toward one of the pieces of equipment he intended to load. As he swung the boom, the crane fell over on its side and killed two people, Tai Vong and Blake Carlisle, who were both working for OSG Lightering. Four other people at the scene alleged both physical and emotional injuries.

Shortly after the accident, several wrongful-death and personal-injury lawsuits were filed in Texas state court against T&T and OSG Lightering. T&T promptly proposed mediation with the wrongful-death plaintiffs. A few days before the scheduled mediation, T&T's counsel sent a letter to OSG Lightering's counsel, seeking a defense, indemnity, and additional insurance coverage under the Master Services Agreement.

The Master Services Agreement that governed the contractual relationship between T&T and OSG Lightering included indemnification provisions. OSG Lightering refused T&T's demands on the ground that the Agreement had expired in December 2014, before the accident occurred, and that there was no contractual obligation to indemnify or defend. T&T maintains that OSG Lightering's continued performance under the terms of the Agreement constituted an implied renewal. T&T alleges that it was forced to defend and settle all of the claims stemming from the accident, and it now seeks full indemnity from OSG Lightering. In response, OSG Lightering and its insurers brought this suit, seeking a declaratory judgment that the Agreement does not govern OSG Lightering's relationship with T&T and that neither it nor its insurers has a contractual obligation

to defend, indemnify, or provide added insurance to T&T.

## B.     The Master Services Agreement

T&T and OSG Lightering entered into the Master Services Agreement on January 1, 2011.

(Docket Entry No. 29-1 at 8).  Under the Agreement, OSG Lightering paid T&T $16,500 monthly.

T&T agreed to the following:

> **a.  Wharfage and Storage areas:** T&T will provide wharf space
> where up to a total of three (3) of [Lightering's] offshore workboats
> of up to 200 feet in length may simultaneously be safely moored
> always afloat. . . . T&T will provide storage space at said location for
> [Lightering's] ancillary equipment including, fenders, cargo hoses,
> shipping containers and parking for [Lightering's] chartered
> workboat personnel, representatives and customers . . . .
>
> T&T will also provide approximately 5,000 square feet of warehouse
> for [Lightering's] use. It is expressly understood that while wharfage
> and storage space sufficient for the above purposes will be provided,
> such space will also be used for the mooring of T&T vessels, vessels
> of its other clients and storage of equipment owned by T&T and
> others.
> . . .
> **b.  Dockside Services.**  T&T will ensure that adequate labor is
> available at the Facilities to accomplish such tasks as [Lightering]
> may reasonably require, including loading and discharging equipment
> from [Lightering's] workboats, general repairs to [Lightering's]
> equipment and the like. [Lightering] and its sublessees shall utilize
> T&T's services while at the Facilities.

(Docket Entry No. 29-1 at 9–10).  These parties signed a one-page addendum on May 13, 2013,

reducing the monthly payments from $16,500 to $15,500.  (*Id.* at 26).

The Agreement contained a choice-of-law provision.  It stated: "[t]his Agreement shall be

governed and construed in accordance with the general maritime laws of the United States, and to

the extent maritime law is not applicable then by the laws of the State of Texas."  (*Id.* at 23).  The

Agreement provided an effective term of four years from January 1, 2011, (*Id.* at 21), and did not

contain an automatic renewal provision.

In January 2015, T&T employee Deborah Crump sent OSG Lightering employees Cameron Kehm and Clayton Wrenn an email stating that the "[l]ease agreement" between the two companies had expired on December 31, 2014, and attaching a new agreement to be signed. (Docket Entry No. 31-1 at 29–30). Wrenn replied that OSG Lightering needed to discuss the new agreement in further detail, but he believed that "our current contract has a provision that facilitates month-to-month lease (evergreen) upon expiration." (*Id.* at 29). Wrenn also stated that OSG Lightering would have to review the existing Agreement to be sure. He also included that T&T should "rest assured" because OSG Lightering was not considering relocating to a different facility, but needed only a chance to consider renewing the Agreement. (*Id.*). According to OSG Lightering, T&T allowed it to continue operating at T&T's facilities after December 31, 2014, which it did, until the September 2017 accident. OSG Lightering also states that T&T increased the monthly rate back to $16,500 in February 2015. OSG Lightering paid the increased rate after February 2015.

T&T now moves to dismiss OSG Lightering's suit for lack of subject matter jurisdiction, arguing that the Agreement is not a maritime contract and the court therefore lacks maritime jurisdiction. (Docket Entry No. 29). OSG Lightering responded, and T&T replied. (Docket Entry Nos. 31, 35). The issue is the nature of the Agreement. OSG Lightering argues that the Agreement is a maritime contract that is under the court's maritime jurisdiction. T&T disputes that, arguing that the Agreement is fundamentally not a maritime contract, and that the court lacks subject matter jurisdiction.

## II.     The Legal Standard

Federal Rule of Civil Procedure 12(b)(1) governs challenges to a court's subject matter

jurisdiction. "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Bloom v. Mem'l Hermann Hosp. Sys.*, 653 F. App'x 804, 805 (5th Cir. 2016). "Lack of subject-matter jurisdiction may be found in the complaint alone, the complaint supplemented by the undisputed facts as evidenced in the record, or the complaint supplemented by the undisputed facts plus the court's resolution of the disputed facts." *Gonzalez v. United States*, 851 F.3d 538, 543 (5th Cir. 2017).

The party asserting jurisdiction has the burden of proof on a Rule 12(b)(1) motion to dismiss. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). The plaintiff must prove that jurisdiction exists. *Id.* Examining a Rule 12(b)(1) factual challenge to subject matter jurisdiction does not implicate the merits of a plaintiff's cause of action and the district court has substantial authority "to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Arena v. Graybar Elec. Co.*, 669 F.3d 214, 223 (5th Cir. 2012). The court has wide discretion to consider affidavits or other documents and to hold a limited evidentiary hearing to resolve disputed jurisdictional facts. *See Superior MRI Servs., Inc. v. All. Healthcare Servs., Inc.*, 778 F.3d 502, 504 (5th Cir. 2015). The court may consider matters outside the pleadings to resolve factual challenges to subject matter jurisdiction without converting the motion to dismiss to one for summary judgment. *See Battaglia v. United States*, 495 F. App'x 440, 441 (5th Cir. 2012).

## III. Analysis

### A. OSG Lightering's Objections to Teichman's Declaration

OSG Lightering objects to 14 different statements in the declaration of Kevin Teichman, a T&T representative. (Docket Entry No. 32). OSG Lightering's motion to strike Teichman's declaration is granted in part and denied in part. The analysis is organized based on OSG

Lightering's grounds for objecting.

### i. Legal Conclusions

OSG Lightering objects to four statements in Teichman's affidavit as legal conclusions or opinions. *See Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir.1983) (it is improper for a witness to give legal conclusions).

In paragraph 5, Teichman describes "fenders and hoses" as "not appurtenances of any vessel . . . ." (Docket Entry No. 29-1 at 3). OSG Lightering argues that this is an impermissible legal opinion. Whether something "is appurtenant" to a vessel is frequently disputed and is subject to analysis by courts. *Malin Int'l Ship Repair & Drydock, Inc. v. Modu Prospector*, 161 F. Supp. 3d 481, 488 (S.D. Tex. 2015) ("But the question of what is—and what is not—an 'appurtenance' to which a maritime lien attaches is the subject of much dispute."); *see also* 70 Am. Jur. 2d Shipping § 141 ("Ships are usually transferred with their 'appurtenances,' and the question as to what that term includes cannot be definitely determined by any precise definition."). At oral argument, T&T pointed out that Teichman is in a position, and has enough experience, to have personal knowledge and familiarity with the operations at the Pelican Island facility. The description that the fenders and hoses were "not appurtenant" is industry shorthand, according to T&T, describing Teichman's personal knowledge that the fenders and hoses were stored on land and not attached to a boat. Teichman's statement that the fenders and hoses are not appurtenances of a vessel, with this explanation, is not an inadmissible legal conclusion. The objection is overruled.

In paragraph 9, Teichman states that "the fenders and hoses were not treated as 'cargo' stored for short periods between unloading and transport to some other destination." (Docket Entry No. 29-1 at 9). OSG Lightering objects on the ground that this statement is an inadmissible legal

conclusion. T&T responds that OSG Lightering provides no legal support for why the statement is a legal conclusion, rather than an observation by a T&T representative based on personal experience and knowledge. T&T explained at oral argument that Teichman's testimony is based on his industry knowledge and personal observation of whether the fenders and hoses were treated as cargo stored for short periods between unloading and shipment elsewhere and not treated as equipment stored on land for longer periods. The objection is overruled.

OSG Lightering objects to paragraphs 12, 13, and 14 of Teichman's declaration. The paragraphs break down charges under the Agreement between maritime and non-maritime services. OSG Lightering argues that this testimony presents inadmissible legal opinions. The court agrees, to an extent. The central issue before the court is the question of maritime versus non-maritime services. To the extent that Teichman's testimony states which services are maritime and which services are non-maritime without factual explanation, the objection is sustained. To the extent that the testimony explains the percentages of time or money spent on specifically described categories of services, such as loading and unloading vessels, the objection is overruled.

OSG Lightering objects to paragraphs 15 through 20 as inadmissible legal conclusions. T&T argues that there are no legal conclusions in these paragraphs. OSG Lightering identifies only one example of a legal conclusion—the last sentence of paragraph 15 in the declaration, which states that there were no material changes in the Agreement terms after its expiration. Teichman's statement is fairly read as a statement based on his personal knowledge of the course of contract performance, concluding that the parties performed the Agreement the same way before and after the expiration date, with the exception of the monthly payment amount. There are no inadmissible legal

conclusions in paragraphs 15 through 20.  OSG Lightering's objections to legal conclusions in paragraph 15 through 20 are overruled.

### ii.    Parol Evidence

OSG Lightering objects to numerous statements in Teichman's declaration as parol evidence that contradicts the Agreement between OSG Lightering and T&T.  T&T argues that Teichman's statements instead explain the parties' performance of the Agreement based on his personal knowledge.

Parol evidence is a rule of contract interpretation.  *See* BRYAN A. GARNER, GARNER'S DICTIONARY OF LEGAL USAGE 656 (3d ed. 2011) (the "parol-evidence rule . . . is commonly thought of as an evidentiary rule, but 'it is probably best regarded as a rule of substantive law.'" (quoting P.S. ATIYAH, AN INTRODUCTION TO THE LAW OF CONTRACT 161–62 (3d ed. 1981))); *see also Boston Ship Repair LLC v. Ocean Chips Inc.*, No. 4:14-CV-405, 2016 U.S. Dist. LEXIS 109745, at *7 (S.D. Tex. Aug. 18, 2016) ("The terms of a maritime contract are given their plain meaning unless the provision is ambiguous." (quoting *Weathersby v. Conoco Oil Co.*, 752 F.2d 953, 956 (5th Cir. 1984))).  Courts cannot consider contradictory parol evidence of the parties' intended contract meaning—including their intent to form a maritime contract—unless the language of the contract is ambiguous.  *See Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 332–33 (5th Cir. 1981) ("Federal maritime law is different: a court may not look beyond the written language of the document to determine the intent of the parties unless the disputed contract provision is ambiguous.").  A court may evaluate evidence of the course of performance and may consider "evidence of the work actually performed."  *In re Larry Doiron, Inc.*, 879 F.3d 568 (5th Cir. 2018).

The issue here is not one of parol evidence. The court is not asked to determine the meaning of an ambiguous contract term. At this stage, the court is conducting a federal jurisdictional inquiry and may consider relevant evidence outside the pleadings, including evidence of contract performance. *See, e.g.*, *Enron Corp. Secs. v. Enron Corp.*, 279 F.R.D. 395, 403 (S.D. Tex. 2011) ("If it is a factual attack, the Court may consider any evidence (affidavits, testimony, documents, etc.) submitted by the parties that is relevant to the issue of jurisdiction. A defendant making a factual attack on a complaint may provide supporting affidavits, testimony or other admissible evidence." (citing *Irwin v. Veterans Admin.*, 874 F.2d 1092, 1096 (5th Cir. 1989); *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981))); *see also Doiron*, 879 F.3d at 576 n.47 ("When work is performed in part on a vessel and in part on a platform or on land, we should consider not only time spent on the vessel but also the relative importance and value of the vessel-based work to completing the contract."). The evidence that OSG Lightering objects to is admissible because it addresses the parties' performance of the Agreement.

OSG Lightering objects to Teichman's statements in paragraphs 5 and 6 about the nature of OSG Lightering's business, the services, and the space T&T provided OSG Lightering, arguing that those statements are parol evidence that contradicts the terms of the Agreement. By describing his understanding of the nature of OSG Lightering's business, the amount of space T&T provided OSG Lightering, and the purposes for which OSG Lightering used that space, Teichman's statements describe the "work actually performed," based on his personal knowledge. *Doiron*, 879 F.3d at 568. These statements are not inadmissible parol evidence. OSG Lightering's objections to paragraphs 5 and 6 are overruled.

In paragraph 10, Teichman provides details about the monthly amount OSG Lightering paid T&T and states that T&T did not charge OSG Lightering for the dock space. OSG Lightering argues that this statement is parol evidence because it contradicts the Agreement and invoices. Although the statement includes disputed facts, it is not parol evidence because it describes the invoices and payments made in the course of party performance. OSG Lightering's objections to paragraph 10 are overruled.

OSG Lightering also argues that the statements in paragraphs 12 and 14 are inadmissible parol evidence. Paragraph 12 attests to the accuracy of the financial summaries in, and explains the contents of, Exhibit 3. Paragraph 14 explains the figures in Exhibit 5, which calculate the days T&T provided OSG Lightering with vessel loading and unloading services. These calculations may be disputed, but they are not inadmissible parol evidence because they are information about the course of contract performance. OSG Lightering's objections to paragraphs 12 and 14 are overruled.

### iii.    Reliability

OSG Lightering objects to several other statements in Teichman's declaration because they "lack a reliable basis." (Docket Entry No. 32 at 2). OSG Lightering argues that paragraphs 5 and 6, which provide figures regarding the total space in the premises used by OSG Lightering and the space used for parking and dockage, lack a reliable basis because those statements do not explain how Teichman calculated the numbers other than by using an aerial photo. T&T argues that Teichman has testified that he has personal knowledge and that the objection goes to the weight of the evidence, not its admissibility. The aerial photo, with demarcated boundaries between the dock space, near-dock storage, and the rest of the property, provides a sufficient showing of how Teichman arrived at these square-footage figures. OSG Lightering can dispute these square-footage

figures, but the statements do not lack an evidentiary basis. OSG Lightering's reliability objections to paragraphs 5 and 6 are overruled.

In paragraph 8, Teichman states that OSG Lightering transferred petroleum products between vessels and brought only smaller supply boats to the premises. OSG Lightering argues that Teichman lacks personal knowledge of these details about its business. T&T argues that Teichman is an officer of the company and has personal knowledge of the facts he describes. Teichman states that he is an officer of Teichman, the company that OSG Lightering hired to load and unload its boats. The court can reasonably infer that he has personal knowledge about the size of the boats that OSG Lightering brought to his company and about the work these boats performed. Teichman does not purport to have personal knowledge of OSG Lightering's lightering operations, which took place offshore and were not the subject of the Agreement between T&T and OSG Lightering. OSG Lightering's objections to paragraph 8 are overruled.

OSG Lightering objects to paragraph 9, in which Teichman states that the fenders and hoses were taken off different vessels at various times and stored for long periods before being loaded onto those vessels or other vessels. OSG argues that the statement lacks a reliable basis because Teichman does not state how he knows this information. Teichman is an officer of the company responsible for loading and unloading these fenders and hoses. The court can reasonably infer that he had personal knowledge about loading and unloading the fenders and hoses. In pages 30–34 of Exhibit 4, Teichman provides the dates his company loaded the fenders and hoses onto and off boats. (Docket Entry No. 29-1, Ex. 4 at 30–34). Based on the number of days his company spent loading fender and hoses, Teichman also had a reliable basis to know how many days these fenders and hoses spent in storage. OSG Lightering's objections to paragraph 9 are overruled.

In paragraphs 12, 13, and 14, Teichman provides dollar amounts and percentages for payments OSG Lightering made to T&T for dockage and office space, compared with payments for vessel loading and unloading services. He also summarizes T&T's daily and monthly invoices and testifies to the number of days T&T provided loading or unloading services to OSG Lightering over a stated period. OSG Lightering argues that because Teichman did not explain how he calculated the figures, his statements lack a reliable basis. T&T responds, arguing that Teichman testified that he has personal knowledge that forms the basis of his statements, that the objections go to the weight of the evidence, and that OSG Lightering has not offered or identified evidence that contradicts Teichman's statements.

Teichman refers to Exhibits 3 and 4 to support his statements. Exhibit 3 provides a chart summarizing the charges under the Agreement, divided by category and by maritime and non-maritime character. Teichman explains in his declaration that the chart was created as a summary of the daily reports and invoices kept over the course of the contractual relationship between T&T and OSG Lightering. Although these are aggregate figures and not detailed calculations, Teichman makes clear the basis of the numbers. (Docket Entry No. 29-1, Ex. 3–4). OSG Lightering may challenge the weight of the evidence and may present contrary evidence, but the objection to admitting these statements and exhibits is overruled, with one exception. To the extent that these statements categorize charges as maritime or non-maritime, without explanation, those conclusory portions of the statements are stricken as legal conclusions.

OSG Lightering objects to paragraphs 17 through 20—in which Teichman states that OSG Lightering behaved as if it agreed to extend the Agreement beyond 2014—as lacking an evidentiary basis. In paragraph 16, Teichman states that T&T continued to provide OSG Lightering with the

same services before and after the Agreement expired, and that OSG Lightering continued to pay for those services. Although OSG Lightering disputes Teichman's description of its post-expiration conduct, that dispute goes to the weight of the evidence. Teichman has a sufficient basis to testify about the parties' course of performance. OSG Lightering's objections to paragraphs 17 through 20 are overruled.

### iv. Contradictions

OSG Lightering objects to paragraph 10 and paragraphs 15 through 20 of Teichman's declaration, arguing that those statements contradict the declaration of OSG Lightering's witness, Clayton Wrenn. T&T argues that these objections are comments on the weight of the evidence, not its admissibility. "Even if there is a conflict between the affidavit testimony of one witness and the deposition testimony of another witness, however, that is not a basis to exclude either." *Johnson v. Saks Fifth Ave. TX, LP*, No. CIV.A. H-05-1237, 2007 WL 781946, at *10 (S.D. Tex. Mar. 9, 2007). Because a disagreement between witnesses is not a sufficient reason to exclude evidence, OSG Lightering's objections to these statements are overruled.

OSG Lightering objects to paragraph 18, in which Teichman states that OSG Lightering advised that it was continuing the Agreement on a month-to-month basis, arguing that it contradicts the text of the referenced emails. OSG Lightering does not allege that Teichman contradicts his own previous testimony. That the evidence conflicts with other evidence is not a basis for exclusion. The objection goes to the weight of the evidence. OSG Lightering's objection to paragraph 18 is overruled.

### v. Relevance

OSG Lightering objects to three statements on the basis of relevance. Evidence is relevant when it "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." FED. R. EVID. 401. "Irrelevant evidence is not admissible." FED. R. EVID. 402. OSG Lightering argues that the final clause in paragraph 10's last sentence, "nor was OSG entitled to or given any credit for not using the dock space," is irrelevant. That OSG Lightering received no credit for not using the dock space supports Teichman's statement that T&T did not specifically charge OSG Lightering for the dock space, which in turn supports the defendants' argument that the Agreement was not primarily for dock space. The last clause is relevant, and OSG Lightering's objection is overruled.

OSG Lightering argues that paragraphs 12 through 14 are irrelevant, to the extent they concern anytime other than the years 2011 to 2014. OSG Lightering argues that the Agreement expired in 2014. T&T argues that both parties abided by the Agreement terms, other than the adjusted rent, after it expired. Financial information and invoices from the years after 2014 may assist the court in determining both the nature of the Agreement and whether the parties continued performing the Agreement after December 31, 2014. OSG Lightering's relevance objections to paragraphs 12 to 14 are overruled.

OSG Lightering argues that Teichman's statement in paragraph 17, that "OSG never once claimed or suggested to T&T in any way, that OSG did not believe the MSA governed the parties' relationship," is irrelevant because OSG Lightering had no obligation to make that claim or suggestion. (Docket Entry No. 32 at 6). Teichman's statement is relevant because it supports T&T's argument that both parties, through the course of performance, continued to perform the Agreement after it expired. OSG Lightering's objection to paragraph 17 is overruled.

### B.    The Parties' Contentions

T&T moves to dismiss on the ground that the Agreement is not a maritime contract, and that the court lacks subject matter jurisdiction.  T&T relies on *In re Larry Doiron, Inc.*, 879 F.3d 568 (5th Cir. 2018) (en banc), and *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14 (2004), to argue that  the court must look at the principal objective of the contract—what goods or services the parties agreed to provide each other; what they were actually provided; and whether either party agreed to provide a vessel or perform substantial work from a vessel—to determine whether the contract at issue is a maritime contract.  T&T characterizes the Agreement as one for "a mix of property and services," including a lease of real property and provisions for labor and equipment, and that any maritime services, such as the loading or unloading of OSG Lightering's chartered workboats, were incidental to the core purpose of the Agreement.  (Docket Entry No. 29 at 12).

OSG Lightering responds that the Agreement is fundamentally a maritime contract.  OSG Lightering argues that T&T relies on the incorrect legal standard to argue that performing substantial work from a vessel is required for the Agreement to be a maritime contract.  OSG Lightering distinguishes *Doiron*, arguing that it was limited to maritime contracts involving oil and gas exploration, drilling, and production, which this Agreement does not.  The proper test, OSG Lightering argues, comes from *Kirby*, and requires a holistic evaluation of the nature and character of the Agreement, looking at whether its principal objective is maritime commerce.

### C.    Is the Master Services Agreement a Maritime Contract?

Although the issue can be stated simply, the case law is anything but simple.  *See Kirby*, 543 U.S. at 23 ("Our cases do not draw clean lines between maritime and non-maritime contracts."); *Doiron*, 879 F.3d at 571 ("Our cases in this area have long been confusing and difficult to apply.");

*D'Amico Dry, Ltd. v. Primera Mar. (Hellas), Ltd.*, 886 F.3d 216, 223 (2d Cir. 2018) ("The question is clear, but the law is murky."); WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 3675 (noting the "fragmented and somewhat discordant historical development of maritime contract law" before *Kirby*).

The leading case is *Kirby*. 543 U.S. at 18. The dispute there involved two bills of lading for the transportation of goods from Australia to Alabama. The goods traveled first by sea to the United States and then to Huntsville, Alabama by train. The goods were damaged during the railroad portion of the journey. The parties disputed whether the bill of lading governing the shipment was maritime in nature, because the damage had occurred on land. The Supreme Court held that the contracts were maritime in nature and governed by federal law. *Id.* at 23. In doing so, the Court set out the proper framework for determining whether a contract is maritime or non-maritime, focusing on "whether the principal objective of a contract is maritime commerce." *Id.* at 25.

The *Kirby* Court reiterated the principle that the inquiry into whether a contract is maritime in nature is a "conceptual rather than spatial" one. *Id.* at 23 (citing *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961)). "To ascertain whether a contract is a maritime one, we cannot look to whether a ship or other vessel was involved in the dispute . . . . [n]or can we simply look to the place of the contract's formation or performance." *Id.* at 23–24. "Instead, the answer 'depends upon . . . the nature and the character of the contract,' and the true criterion is whether it has reference to maritime service or maritime transactions.'" *Id.* at 24 (alterations in original) (quoting *N. Pac. S. S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.*, 249 U.S. 119, 125 (1919)). In short, geography is not the driving factor and "the shore is now an artificial place to draw a line." *Id.* at 25. The contracts at issue in *Kirby* were maritime because "their primary objective [was] to accomplish the

transportation of goods by sea . . . ." *Id.* at 24. The railway portion of the journey, the Court explained, was a "fringe" portion compared to the transportation by sea. *Id.* at 25.

The Fifth Circuit's most recent opinion on determining whether a contract is maritime in nature is *Doiron*, 879 F.3d at 569. The Fifth Circuit considered, en banc, the implications of *Kirby* on the test it had previously set out in *Davis & Sons, Inc. v. Gulf Oil Corp.*, 919 F.2d 313 (5th Cir. 1990), "for determining whether a contract for performance of specialty services to facilitate the drilling or production of oil or gas on navigable waters is maritime." 879 F.3d at 569. In *Doiron*, the Fifth Circuit created a simplified test, largely eliminating the clunky, six-factor test from *Davis & Sons*:

> First, is the contract one to provide services to facilitate the drilling or production of oil and gas on navigable waters? Second, if the answer to the above question is 'yes,' does the contract provide or do the parties expect that a vessel will play a substantial role in the completion of the contract?

*Id.* at 576.

OSG Lightering contends that *Doiron* is of limited application in this context because the court limited its analysis to contracts for the production of oil and gas. T&T argues that *Doiron* applies here because the Fifth Circuit stated that the *Doiron* test "would be helpful" in other, non-oil-and-gas contexts, and because it drew support for its holding from other circuits' consideration of non-oil-and-gas contracts in light of *Kirby*, explaining that those decisions were "not inconsistent" with the Fifth Circuit's test. *Id.* at 576 n.49.

As to the scope of its decision, the Fifth Circuit stated:

> We deal today only with determining the maritime or nonmaritime nature of contracts involving the exploration, drilling, and production of oil and gas. If an activity in a non-oil and gas sector involves maritime commerce and work from a vessel, we would expect that

> this test would be helpful in determining whether a contract is
> maritime.

*Id.* at 577 n.52; *see also id.* at 576 ("Based on the principles laid out in *Kirby*, we adopt the

following two-pronged test to determine whether a contract *in this context* is maritime . . . .")

(emphasis added).

*Kirby* states that for a contract to be maritime, its principal objective must be maritime

commerce. The *Doiron* opinion applies *Kirby* to interpret a "principal objective." The first step—is

the activity at issue oil and gas?—is a substitute for the broader question, is this maritime

commerce? *See Doiron*, 879 F.3d at 575 ("Our cases have long held that the drilling and production

of oil and gas on navigable waters from a vessel is commercial maritime activity."). If yes, then the

Fifth Circuit asks if the contract provides, or the parties expect, "that a vessel will play a substantial

role in the completion of the contract." *Id.* at 576. "If so, the contract is maritime in nature." *Id.*

Although *Doiron* limited its holding to the facts of the case, which came from the oil-and-gas sector,

the court expressly noted, en banc, that it would expect the same test to apply in a non-oil-and-gas

context.

Outside the oil and gas context, the test first requires the court to ask whether the activity

"involves maritime commerce and work from a vessel." *Id.* at 577 n.52. If so, then the court asks

whether a vessel plays a substantial role in completing the contract.

Under *Doiron* and *Kirby*, determining whether a contract is maritime requires three steps:

(1) the activity must be maritime commerce; (2) the activity must involve work from a vessel; and

(3) the contract must provide or the parties must expect that a vessel will play a substantial role in

completing the contract. If all three are satisfied, then the contract's principal objective is maritime

commerce and the contract is maritime in nature.

The case law does not provide a simple definition of "maritime commerce." "Though the rule [from *Kirby*] seems simple in theory, its application proves to be complicated." *Dockside Dev. Corp. v. Ill. Int'l Port. Dist.*, 479 F. Supp. 2d 842, 846 (N.D. Ill. 2007). "Thus, most courts resort to a case-by-case approach, relying heavily on precedent." *Id.* Not every contract relating to a maritime activity falls under the court's admiralty jurisdiction. "In general, a contract relating to a ship in its use as such, or to commerce or navigation on navigable waters, or to transportation by sea or to maritime employment is subject to maritime law and the case is one of admiralty jurisdiction, whether the contract is to be performed on land or water." 1 BENEDICT ON ADMIRALTY § 182.

However,

> [a] contract is not considered maritime merely because the services to be performed under the contract have reference to a ship or to its business, a ship is the object of such services, or it has reference to navigable waters. To be considered maritime, there must be a direct and substantial link between the contract and the operation of the ship, its navigation, or its management afloat, taking into account the needs of the shipping industry, for the very basis of the constitutional grant of admiralty jurisdiction was to ensure a national uniformity of approach to world shipping.

*Id.*; *see also Gulf Coast Shell & Aggregate LP v. Newlin*, 623 F.3d 235, 240 (5th Cir. 2010) ("A maritime contract is one 'relating to a ship *in its use as such*, or to commerce or navigation on navigable waters, or to transportation by sea or to maritime employment.'" (emphasis in original) (quoting *J.A.R., Inc. v. M/V Lady Lucille*, 963 F.2d 96, 98 (5th Cir. 1992))).

T&T breaks down the Agreement by looking at the percentage of time and money spent to provide different services, arguing that the bulk of the time and expenses were for non-maritime services. (Docket Entry No. 29 at 13). T&T also argues that neither party agreed to furnish a vessel

or perform work from a vessel for the other. OSG Lightering argues that lightering is generally a maritime activity, as are the types of services T&T provided, such as wharfage, dockside storage, and loading or unloading equipment from chartered vessels.

Lightering is a traditional maritime activity. *Cf. Saudi v. S/T Marine Atl.*, 159 F. Supp. 2d 492, 497 (S.D. Tex. 2000) (lightering is a traditional maritime activity for purposes of maritime tort jurisdiction). Because the Agreement between OSG Lightering and T&T was to facilitate OSG's lightering operation, T&T argues, it is a contract principally for maritime commerce. This argument is unpersuasive. The Agreement between T&T and OSG Lightering was not for lightering operations. The fact that the Agreement supported OSG's lightering operations is informative, but not dispositive. A wide range of non-maritime activities, entirely land based, can "facilitate" maritime commerce. Instead, the court must consider the substance of the Agreement between T&T and OSG Lightering.

The two main components of the Agreement between T&T and OSG Lightering are wharfage and dockside services. T&T concedes that the vessel loading and unloading services it provided are maritime in nature, but argues that those services are only a small part of the Agreement, insufficient to make it maritime in nature. (Docket Entry No. 29 at 17).

"The Fifth Circuit has yet to take up the issue of whether contracts for the lease of dock space fall under federal admiralty jurisdiction. Circuits that have encountered the question have held that the lease of a wharf or dock does not fall within admiralty jurisdiction unless the contract specifies a particular vessel." *Jaspriza v. Schlumberger Tech. Corp.*, No. 10-1859, 2010 U.S. Dist. LEXIS 128592 (E.D. La. Nov. 23, 2010) (citing *Royal Ins. Co. v. Pier 39 Ltd.*, 738 F.2d 1035, 1037–38 (9th Cir. 1984) (wharfage is maritime only if it is provided to a specific vessel); *Goodman*

*v. 1973 26 Foot Trojan Vessel*, 859 F.2d 71, 73 (8th Cir. 1988) (contract to provide wharfage to a particular vessel is maritime); *Proleride Transp. Sys., Inc. v. Union Carbide Corp.*, 498 F. Supp. 680 (D. Mass. 1980); *Gowanus Storage Co. v. U.S. Shipping Bd. Emer. Fleet Corp.*, 271 F. 528, 530 (E.D.N.Y. 1921)); *see also Buck Kreihs Co. v. Bd. of Comm'rs of the Port of New Orleans & Sank, Inc.*, No. 97-970, 1997 WL 666220 (E.D. La. Oct. 27, 1997) (a contract for dock space to repair vessels is not a maritime contract because it was not a contract to repair the ship or to grant docking privileges to a specific vessel). In *Jaspriza*, the court held that "[a]bsent a provision in the contract specifying a particular vessel, the contract bears no direct link to a vessel." 2010 U.S. Dist. LEXIS 128692, at *7; *see also Constantin Land Tr. v. Epic Diving & Servs., LLC*, No. 12-259, 2013 U.S. Dist. LEXIS 44607, at *35 (E.D. La. Mar. 27, 2013).

OSG Lightering argues that neither the Fifth Circuit nor the Supreme Court has approved of the rule that a wharfage contract must refer to a particular vessel in order to be a maritime contract. OSG Lightering argues that this rule would be "untenable in the aftermath of *Kirby*," but OSG cites no case law to the contrary. (Docket Entry No. 31 at 24). By contrast, many of the cases T&T relies on were decided after and considering *Kirby*.

OSG Lightering cites *Flame S.A. v. Freight Bulk Pte. Ltd.*, 762 F.3d 352, 362 (4th Cir. 2014), for the proposition that "Supreme Court [in *Kirby*] has directly held that a maritime contract need not refer to any particular vessel." *Flame* did not consider wharfage contracts, but rather addressed Forward Freight Swap Agreements—essentially futures contracts related to rate and market shipping prices—finding that the fact that those contracts did not specify a particular vessel was not dispositive of their maritime or non-maritime nature. *Id.* As T&T notes, no court has applied *Flame* to the wharfage context, and the essential nature and purpose of a Forward Freight Swap Agreement

is directly to facilitate maritime commerce.

OSG Lightering also relies on *Sisson v. Ruby*, 497 U.S. 358 (1990), to argue that "the storage and maintenance of a vessel at a marina on navigable waters is substantially related to a 'traditional maritime activity' . . . ." *Sisson* is a maritime tort case, not a contract case. In *Kirby*, the Supreme Court made clear that the test for maritime contract jurisdiction is not the same as the test for maritime tort jurisdiction. *See Kirby*, 543 U.S. at 23 ("We have recognized that '[t]he boundaries of admiralty jurisdiction over contracts—*as opposed to torts or crimes*—being conceptual rather than spatial, have always been difficult to draw.' To ascertain whether a contract is a maritime one, we cannot look to whether a ship or other vessel was involved in the dispute, as we would in a putative maritime tort case." (emphasis added) (quoting *Kossick*, 365 U.S. at 735)).

OSG Lightering argues that *Jaspriza* and *Constantin* are distinguishable because the contracts at issue in those cases were substantively equivalent to leases of real property, which the Agreement is not. T&T disagrees, arguing that the Agreement is primarily a lease of real property. OSG Lightering argues that the Agreement does not refer to a "lease" or "rent," and that the substance of the Agreement is not a lease because T&T did not own or lease the Pelican Island facility and could not convey an interest in it to OSG Lightering, and because OSG Lightering was not entitled to exclusive use of the facility.

T&T responds, arguing that it has discovered a number of judicial admissions in which OSG Lightering and its parent company, Overseas Shipholding Group, construed the Agreement as a lease and that OSG Lightering is bound by those statements on the basis of judicial estoppel. T&T points to statements made by OSG Lightering and Overseas Shipholding Group during Chapter 11 bankruptcy proceedings in 2013. (Docket Entry No. 25 at 4). In those proceedings, OSG Lightering

sought court permission to enter into an addendum to the Agreement with T&T, including a sworn statement from the chief restructuring officer for Overseas Shipbuilding Group. (Docket Entry No. 35-2). The chief restructuring officer stated, in part, that "OSG Lightering and T&T entered into the Lease Agreement," "OSG Lightering has leased from T&T approximately 5,000 square feet of warehouse space located on Pelican Island," and "[t]he Lease Agreement is currently set to expire on December 31, 2014." (Docket Entry No. 35-2 at 5). The officer explained that "[t]he Lease Premises serve as an offshore base for OSG Lightering, offering, equipment storage and dock access for work boats, as well as certain services provided by T&T pursuant to the Lease Agreement such as loading, hose testing and repairs," and "[t]he Lease Premises also include an office from which an OSG Lightering employee manages the operations that occur at the Lease Premises." (*Id.*). "Pursuant to the Lease Agreement, OSG Lightering has paid to T&T monthly base rent of approximately $16,500 (or $198,000 annually) (the "Current Monthly Base Rent")." (*Id.*).

OSG Lightering responds that T&T should not be allowed to argue judicial estoppel, because it raised the argument for the first time in its reply brief. OSG Lightering also argues that the judicial estoppel argument fails on the merits because OSG Lightering never stated in the bankruptcy court proceedings that the Agreement was a non-maritime contract and its current position is therefore not inconsistent with the sworn statements to the bankruptcy court that T&T cites.

The first argument is not persuasive. OSG Lightering has had an adequate opportunity to respond to T&T's judicial estoppel in its surreply, and has responded on the merits. (Docket Entry No. 37).

"The doctrine of judicial estoppel prevents a party from asserting a claim in a legal

24

proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *Reed v. City of Arlington*, 650 F.3d 571, 573–74 (5th Cir. 2011) (quoting 18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 134.30 at 63 (3d ed. 2011)). "The purpose of the doctrine is to protect the integrity of the judicial process by preventing parties from playing fast and loose with the courts to suit the exigencies of self interest." *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 385 (5th Cir. 2008) (citation omitted). "The policies underlying the doctrine of judicial estoppel include 'preventing internal inconsistency, precluding litigants from 'playing fast and loose' with the courts, and prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir. 1993). The Fifth Circuit looks at three factors to determine whether to apply judicial estoppel:

> (1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position;

> (2) a court accepted the prior position; and

> (3) the party did not act inadvertently.

*Id.* at 574.

The first element is satisfied. In its response to T&T's motion to dismiss, OSG Lightering argues that "[t]he MSA is not a 'Lease of Real Property,'" and "In Form and Substance, the MSA is a Contract for Services, Not a Lease." (Docket Entry No. 31 at 19). In the bankruptcy court, OSG Lightering stated, under oath, that the Agreement is a lease, which is plainly inconsistent with its present position. The second element is satisfied because the bankruptcy court granted OSG Lightering's motion "authorizing the amendment and assumption of an unexpired lease for premises in Galveston, Texas." (Docket Entry No. 35-3 at 2). Finally, the circumstances indicate that these inconsistent positions were not inadvertent.

OSG Lightering relies on the argument that the Agreement is not a lease to distinguish it from the contracts in other cases that analyze whether a contract is maritime or non-maritime. According to OSG Lightering, whether the Agreement is a lease is a dispositive factor in the analysis and comparison to those cases. OSG Lightering also disputes T&T's argument that the court should look to the parties' own characterizations of the Agreement in considering whether it is maritime, based on the argument that the Agreement is not a lease, despite any prior representation to the contrary.

T&T cites *Icon Amazing, L.L.C. v. Amazing Shipping, Ltd.*, 951 F. Supp. 2d 909, 917 (S.D. Tex. 2013), in which the court noted that the plaintiff's own characterization of the contract as a sale financing contract supported the conclusion that the contract was non-maritime. OSG Lightering distinguishes *Icon*, arguing that "the statements made . . . confirmed the substance of the contract at issue, unlike this case where the T&T Defendants are attempting to use parol evidence to establish the contract at issue is something other than what its form and substance establishes." (Docket Entry No. 31 at 20). Considering the previous sworn statements to the bankruptcy court, however, it is clear that OSG Lightering in fact understood the Agreement to be a premises lease, and the statements confirm that as the substance of the Agreement. Even if the court did not consider the judicial estoppel argument, the outcome would be the same. Even if the Agreement was a lease, that is not dispositive, but it is clearly informative as to the nature and character of the Agreement and whether its substance is primarily maritime commerce.

In *Jaspriza*, the plaintiff owned lots next to a navigable canal in Louisiana and entered into a monthly lease agreement, allowing the defendant to use the dock space on the lots to dock his vessels and load or unload the crew and equipment from those vessels. 2010 U.S. Dist. LEXIS

128592, at *8. The agreement referred to the defendant as "the Lessee" and prohibited "sub-letting." *Id.* Similarly, the Agreement between T&T and OSG Lightering, although referring to OSG Lightering as "Client," referred to "its sublessee's vessels" and expressly provided the right of OSG Lightering "to sublease its mooring rights." (Docket Entry No. 29-1 at 9, 22).

In *Constantin*, the plaintiff owned a dock that it had leased to a third party. 2013 U.S. Dist. LEXIS 44607, at *5. The lease required the plaintiff to approve any sublease. The plaintiff sued, alleging that the defendant had entered into an unauthorized sublease from the third-party lessee and subsequently damaged the dock and illegally dumped materials on the property. The defendant filed a third-party demand against the lessee, who in turn asserted a number of counterclaims against the plaintiff arising from the underlying lease. Because the plaintiff and the third-party defendant were both citizens of Louisiana, the court lacked diversity jurisdiction. The third-party defendant asserted maritime jurisdiction, arguing that the lease was a maritime contract because the property was located on a navigable waterway and that the third-party's sublease to the defendant involved maritime services. *Id.* at 28. The court disagreed, finding that the contract between the third-party defendant and the plaintiff was not a maritime contract. Just as in the present case, the third-party defendant had separate agreements with its customers to perform maritime services. The nature of those agreements, the court explained, did not determine the nature of the agreement between the third-party defendant and the plaintiff. Similarly, the maritime nature of OSG's lightering operations and the services it provides under separate lightering contracts do not determine the nature of the Agreement between T&T and OSG Lightering.

The most salient difference between the cases cited by T&T and this case is the services component. In the *Jaspriza* contract, the court explained that it was "not satisfied that the

Agreement bears a direct link to a fleet of vessels because Landowners did not agree to render services upon any of Schlumberger's vessels." 2010 U.S. Dist. LEXIS 128592, at *8. Here, by contrast, there was a services component of the Agreement. The contract in *Constantin* provided for a dock-space lease, without reference to a particular vessel, and without any services component. 2013 U.S. Dist. LEXIS 44607, at *35. The case law is clear, however, that the wharfage component of the Agreement, which contains no reference to any particular vessel, is not maritime in nature.

The parties both agree that the other component of the Agreement—dockside services—is maritime in nature. (Docket Entry Nos. 29 at 17; 31 at 24). OSG Lightering argues that the portions of the Agreement on the storage of its lightering equipment or "vessel equipment," are analagous to other contracts for the "temporary storage of vessels on land." Because storage of vessels on land is maritime, OSG Lightering argues, so is the storage of vessel equipment under the Agreement. This argument is logically flawed. OSG Lightering did not contract to store its vessels on land. It cites no authority that supports the proposition that vessel-equipment storage is the same as vessel storage. OSG Lightering cites two cases to support its argument. Neither is on point. Both involved contracts to store yachts in dry storage racks at marinas. *See Am. E. Dev. Corp. v. Everglades Marina, Inc.*, 608 F.2d 123 (5th Cir. 1979); *Fireman's Fund Am. Ins. Co. v. Boston Harbor Marina, Inc.*, 406 F.2d 817 (1st Cir. 1969). There are no allegations here that OSG stored its vessels at or in T&T's storage facility.

OSG Lightering also analogizes storage of its equipment with the bailment of cargo before and after that cargo is shipped, citing *Baker Oil Tools, Inc. v. Delta S.S. Lines, Inc.*, 562 F.2d 938 (5th Cir. 1977). *Baker* involved a shipment-of-goods contract, and the related storage of the cargo on land before the ship left the port. The shipment of goods bears a clear and direct link to maritime

28

commerce. The analogy between goods to be shipped under a bill of lading and lightering equipment stored on land between uses is unpersuasive.

The court concludes that in this Agreement, neither wharfage nor equipment storage is a maritime commerce activity, but vessel loading and unloading is. The only part of the Agreement that involves "work from a vessel" is the equipment loading and unloading. *Doiron*, 879 F.3d at 577 n.52. Because this is a mixed contract, the final issue is whether the maritime portion is the "principal objective" of the Agreement, or whether the Agreement provides, or the parties expect, that a vessel will play a "substantial role in the completion of the contract." *Id.* at 576.

T&T argues that the course of performance under the Agreement amply shows that the it was for primarily non-maritime components. T&T argues that 74% of the real property that was the subject of the Agreement was used for outside storage, parking, office space, and warehouse space; 84.35% of the payments made under the Agreement were for office and warehouse space, outside storage space, parking, dock space, and non-vessel related equipment and labor; only 15.65% of the payments OSG Lightering made to T&T over 5 years were for maritime services of loading and unloading vessels; and T&T provided loading and unloading services to OSG Lightering only 11.9% of the time over those 5 years. (Docket Entry No. 29 at 15–18). The case law does not provide a bright-line rule for what percentage of a contract constitutes an incidental component, but these statistics do not present a close call. They show that the maritime component of the Agreement was incidental to the non-maritime components, and that the principal objective of the Agreement was the non-maritime objective of the lease of real property. The maritime components of the Agreement are minimal and insufficient to make the entire Agreement a maritime contract.

Both parties characterized the Agreement as a lease of property, not as a contract with a

principal objective of maritime commerce. The portion of the Agreement that involved a vessel was not substantial. The maritime portion of the Agreement—the loading and unloading of vessels—had an attenuated connection to maritime commerce. T&T loaded and unloaded equipment that itself was not bound for maritime commerce, but that was used by OSG Lightering, as part of a separate contract with a third-party, to facilitate maritime commerce through its lightering operations. This is not the "direct and substantial link between the contract and the operation of the ship, its navigation, or its management afloat, taking into account the needs of the shipping industry," required to transform a maritime activity into maritime commerce. BENEDICT § 182. The court concludes that the Agreement did not have a principal objective of maritime commerce.

## IV.     Conclusion

Because the Agreement is non-maritime in nature and character, the court lacks admiralty and maritime jurisdiction under 28 U.S.C. § 1333. The case is dismissed for lack of subject matter jurisdiction.

SIGNED on July 16, 2018, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge